Eugene J. ARNFELD and Henry J. Moses, Executors of the Estate of Andrew Wineman, Deceased, and Eugene J. Arnfeld and Mortimer H. Meyer, Successor Executors of the Estate of Elsa Wineman, Deceased,

v.

**UNITED STATES.**

No. 477–55.

United States Court of Claims.

July 16, 1958.

Joseph H. Sheppard, Washington, D. C., for plaintiffs. J. Marvin Haynes, Haynes & Miller, N. Barr Miller, and Arthur H. Adams, Washington, D. C., were on the briefs.

David R. Frazer, Washington, D. C., with whom was Asst. Atty. Gen., Charles K. Rice, for defendant. James P. Garland, Washington, D. C., was on the brief.

JONES, Chief Judge.

Plaintiffs, executors of the estates of Andrew and Elsa Wineman, sue to recover income taxes and deficiency interest for the year 1951. The amount claimed is $25,494.25.

The issue presented for our determination is whether the increment realized by taxpayer Elsa Wineman upon the transfer of an annuity contract prior to its maturity constitutes ordinary income or capital gain.

The annuity contract in question was acquired by Andrew Wineman on January 6, 1933, and thereafter was assigned to his wife, Elsa Wineman, on January 11, 1933. Issued by the Penn Mutual Life Insurance Company, the policy was an 18-year optional deferred income contract, to mature when the insured reached the age of seventy years. Part of the contract consisted of a variable deposit rider which permitted deposits at any time by the insured or his assignees. The aggregate deposited was not to be in excess of $100,000, unless the company should waive such limit. The maturity date of the policy was January 6, 1951.

The contract was purchased by Andrew Wineman from a Howard A. Kaichen who, at the time, held a general agency contract with the Penn Mutual Life Insurance Company. Kaichen represented that company as a general agent from 1932 until 1941 when his contract was terminated. He thereafter had no connection with the Penn Mutual company.

The optional deferred income contract was first called to Andrew Wineman's attention by Kaichen in late 1932. The early depression years had seriously undermined financial conditions in Detroit, Michigan, where Andrew Wineman resided and carried on his business. As a result, those who had invested in stocks, bonds, and real estate began to witness the decline of their property values. To meet the needs of such persons, by way of providing a conservative investment, the Penn Mutual Life Insurance Company, along with other insurance companies, began offering policies of the type purchased by Wineman.

With the coming of the postwar inflationary spiral, however, conservative investments such as reflected in the optional deferred income contract became less attractive than other investments. For that reason, Wineman thought that he had made a poor investment. His misgivings turned to criticism of Kaichen for inducing him to purchase the annuity contract. Because of such criticism, Kaichen finally suggested to Wineman that he sell the policy and use the proceeds to acquire common stock or other more profitable securities. Kaichen thought it advisable to sell the policy, rather than surrender it to the insurer for its cash surrender value, because he believed that an income tax saving could thereby be realized. His belief concerning the tax consequences of such a transaction was confirmed by Wineman's regularly employed accountants after consultation with their Washington, D. C., office. Briefly, Wineman's accountants informed him that if a bona fide sale of the policy were made, the Treasury Department would treat any profit derived therefrom as long-term capital gain instead of as ordinary income.

Kaichen thereafter suggested that the annuity contract be sold to the National Bank of Detroit, since he had no intention of purchasing it himself. Following this suggestion, Wineman went to the bank on January 3, 1951, accompanied by Kaichen. They were informed by the vice president of the bank that, since the National Bank of Detroit was a national bank, it was precluded by law from making the purchase. The vice president did suggest, however, that the bank would loan Kaichen $117,000, the agreed selling price of the contract, on Kaichen's note with the policy as collateral if he would buy the policy.

On the same day, Elsa Wineman transferred the policy to Kaichen at the agreed price of $117,000. This amount was borrowed from the bank pursuant to the above mentioned agreement, with the policy assigned as collateral.

On January 4, 1951, the National Bank of Detroit mailed the policy to the Penn Mutual Life Insurance Company, along with a letter requesting that the policy's cash surrender value be forwarded to the bank. The following day, January 5, 1951, Kaichen issued his check to Elsa Wineman for $117,000, and thereby satisfied the purchase price of the insurance policy. The cash surrender value of the policy, amounting to $117,330.14, was received by the bank on January 15, 1951.

This amount was applied by the bank in payment of Kaichen's loan and the accrued interest thereon. The balance of $240.77 was then applied to Kaichen's special account.

At the date of acquisition of the annuity contract, January 6, 1933, Andrew Wineman made an initial payment of $10,000. Thereafter, deposits in variable amounts were made by Elsa Wineman. The last deposit was on March 4, 1949. Total payments on the policy aggregated $81,000, which was the cost basis of the contract at the time it was transferred by Elsa Wineman to Howard A. Kaichen.

Taxpayers Andrew and Elsa Wineman filed a point income tax return for the calendar year 1951. The sum of $36,000, being the difference between the cost of the policy and the $117,000 paid by Howard A. Kaichen for its transfer, was reported in the return as capital gain. Subsequently the Commissioner of Internal Revenue determined that such profit amounted to ordinary income. The additional taxes resulting from this determination were duly paid. Claims for refund were filed and later rejected by the Commissioner.

Eugene J. Arnfeld and Henry J. Moses are the duly appointed executors of the estate of Andrew Wineman, who died in 1954. Elsa Wineman died in 1952. Plaintiffs Eugene J. Arnfeld and Mortimer H. Meyer are the executors of her estate.

The Government initially challenges plaintiffs' contention that the profit realized upon the transfer of the annuity contract prior to maturity constitutes capital gain by denying that the transfer was a bona fide "sale or exchange" of property within the meaning of section 117(a) (4) of the 1939 Code.[1] The Government's argument that a bona fide sale or exchange did not take place can be summarized as follows: The transaction was one of accommodation between the National Bank of Detroit, Kaichen, and Andrew Wineman, with the bank and Kaichen acting as agents for Wineman for the purpose of transferring the annuity policy out of Wineman's hands and into the hands of a third party. Thus Kaichen was no more than a conduit through which the "form" of a sale took place.

However, we feel that the broad sweep of this objection, if sanctioned as to the instant facts, could strike at the heart of any sale or exchange. For it is not clear to us just what standards of "horse trad-

---

1. Internal Revenue Code of 1939:
   "§ 117. Capital gains and losses—(a) Definitions.
   "As used in this chapter—
   "(1) Capital assets.
   "The term 'capital assets' means property held by the taxpayer (whether or not connected with his trade or business), but does not include—
   "(A) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;
   "(B) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 23($l$), or real property used in his trade or business;
   "(C) a copyright; a literary, musical, or artistic composition; or similar property; * * *
   *   *   *   *   *

"(D) an obligation of the United States or any of its possessions, or of a State or Territory, or any political subdivision thereof, or of the District of Columbia, issued on or after March 1, 1941, on a discount basis and payable without interest at a fixed maturity date not exceeding one year from the date of issue.
   *   *   *   *   *
   "(4) Long-term capital gain.
   "The term 'long-term capital gain' means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income;
   *   *   *   *   *
   "(b) Deduction from gross income.
   "In the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 per centum of the amount of such excess shall be a deduction from gross income. * * *" [26 U.S.C. (1952 ed.) § 117.]

ing" the Government would have us impose on the business community before we could say that a valid and binding sale had occurred. At the least, it would require businessmen to strike a hard bargain. But such was done here. The bank realized interest on its loan to Kaichen. Kaichen was compensated for his part in the transaction. Further, the trial commissioner's report indicates that Kaichen, when he purchased the annuity policy from Elsa Wineman, was acting in his individual capacity and not as the agent of any company or person. We are satisfied, after examining the record, of the correctness of that determination (finding 11).

■■ More specifically, the Government urges that we view the instant case against the factual background present in Lasky v. Comm'r, 1954, 22 T.C. 13, dismissed, 9 Cir., 1956, 235 F.2d 97 affirmed 1957, 352 U.S. 1027, 77 S.Ct. 594, 1 L.Ed.2d 598. In that case the taxpayer assigned his right in accrued royalties of $820,000 to United Artists for $805,000. A few days later United Artists released the right to Warner Brothers for $820,-000, the amount of the accumulated royalties. The court rejected petitioner's claim that the receipts constituted capital gains, and held the amount received to be ordinary income. Prior to the assignment the taxpayer in Lasky could have collected the royalties at any time since they carried no maturity date with them. According to the Government's interpretation of that case, there was, therefore, no benefit derived by the taxpayer on the assignment, and such was the basis for the court's decision. Similarly here there was no benefit, argues the Government, derived by Wineman on the assignment of the annuity policy —as a matter of fact, assignment of the policy prior to maturity cost Wineman the difference between the maturity value and the sales price, i. e., $330.14. But assuming the Government's interpretation of the holding in Lasky is correct, it

cannot be said that Wineman derived no benefit from the assignment of the annuity contract. For, as mentioned, above, a business purpose guided Andrew Wineman in his initial determination to dispose of the policy: the proceeds of such disposition were to be invested in securities yielding a higher rate of return. His *method* of disposition, however, in electing to sell the policy to a third person rather than surrender it to the issuing company for its cash surrender value was clearly designed to lessen his taxes.[2] But such is the legal right of a taxpayer. Gregory v. Helvering, 1935, 293 U.S. 465, 55 S.Ct. 266, 79 L. Ed. 596; Commissioner of Internal Revenue v. Tower, 1946, 327 U.S. 280, 66 S. Ct. 532, 90 L.Ed. 670.

■ Finally, we have no quarrel with the Government's assertion that substance rather than form determines the tax consequences of a given transaction. We have examined the "substance" of this case and find ourselves in agreement with a statement made by counsel for plaintiffs: in the present case the form of the transaction fully disclosed its substance.

■ The second objection raised by defendant calls for more detailed analysis. It would require us to treat the gain realized on the transaction as ordinary income rather than as capital gain. As already indicated, Andrew Wineman made an initial payment of $10,000 on the contract at the time of purchase. Following the assignment of the policy to his wife, Elsa Wineman made various deposits in variable amounts on the contract. The last payment was made on March 4, 1949. At that time the total payments aggregated $81,000—the cost basis of the contract for tax purposes. The cash surrender value of the policy on its maturity date of January 6, 1951, amounted to $117,330.14. Of this sum, $330.14 represented the fee of the National Bank of Detroit and Kaichen for

---

2. Had the taxpayer here surrendered the policy to the insurer the gain would have been taxable as ordinary income. Avery v. Comm'r, 9 Cir., 1940, 111 F.2d 19; Bodine v. Comm'r, 3 Cir., 1939, 103 F.2d 982.

their part in the transaction. The balance of the proceeds, measured by the consideration paid for assignment of the contract, was received by Elsa Wineman. The difference between the amount received and the cost basis of the annuity contract, i. e., $36,000, is the amount we are now asked to treat as ordinary income.

Counsel for the Government in oral argument directed our attention to the table under Section 5 of the annuity contract wherein is specified the death benefits and the loan or cash values of the policy prior to commencement of the life income payments. As his computations based on that table indicate, amounts deposited under the contract accumulate at 3½ percent interest compounded annually. Thus, the contract's rate of return is fixed. Bearing this fact in mind, the error becomes apparent in plaintiff's basic assertion that the gain realized by Elsa Wineman from the sale of the annuity policy is no different from the gain realized from the sale of corporate stock which has increased in value because of earnings accummulated and retained by the corporation over the period the stock was held by the taxpayer. Certainly it cannot be said that the enhancement in value of corporate stock, affected as it is by a myriad of economic factors, bears any material resemblance to the predictable growth in value of an annuity policy.

Looking to the taxing provision of the Internal Revenue Code of 1939 that would become operative upon maturity of the policy and commencement of the life income payments thereunder, it is to be seen that whether such payments would have been treated under section 22 (b) (2) as amounts received under an endowment contract or as amounts received as an annuity and therefore subject to the 3 percent rule would make no difference in treatment as to the nature of the gain realized under the policy.[3] Essentially, either method of taxation subjects gain under the policy to ordinary income treatment.

This being so, the issue here becomes one of whether plaintiffs can convert what would in time constitute ordinary income under section 22(b) (2) into capital gain.

Courts have had occasion to pass upon the broader question of whether future income may be converted into capital gain a number of times. Moreover, the variety of transactions which have thereby been subjected to judicial review and the uniformity of decisions which have followed amply support the Government's position in this case.

The problem was considered in Helvering v. Smith, 2 Cir., 1937, 90 F.2d 590, where a retiring partner sought to treat as capital gain the proceeds from the "sale" of his interest in the earned

3. Internal Revenue Code of 1939:
   "§ 22. Gross income—(a) General definition.

   *     •     *     *     *

   "(b) Exclusions from gross income. The following items shall not be included in gross income and shall be exempt from taxation under this chapter: * *

   "(2) [as amended by sec. 120(a), Revenue Act of 1942, c. 619, 56 Stat. 798] Annuities, etc.

   "(A) In general. Amounts received (other than amounts paid by reason of the death of the insured and interest payments on such amounts and other than amounts received as annuities) under a life insurance or endowment contract, but if such amounts (when added to amounts received before the taxable year under such contract) exceed the

   aggregate premiums or consideration paid (whether or not paid during the taxable year) then the excess shall be included in gross income. Amounts received as an annuity under an annuity or endowment contract shall be included in gross income; except that there shall be excluded from gross income the excess of the amount received in the taxable year over an amount equal to 3 per centum of the aggregate premiums or consideration paid for such annuity (whether or not paid during such year), until the aggregate amount excluded from gross income under this chapter or prior income tax laws in respect of such annuity equals the aggregate premiums or consideration paid for such annuity. * * *" [26 U.S.C. (1952 ed.) § 22.]

fees of a partnership, both billed and unbilled, to the remaining partners. The court there refused to adopt the taxpayer's argument, emphasizing that as the partnership accounts were received they would constitute ordinary income. In the court's opinion, the "purchase" of that future income did not turn it into capital any more than the discount of a note received in consideration of personal services.

Cases following have employed the same rationale. Thus in Rhodes' Estate v. Comm'r, 6 Cir., 1942, 131 F.2d 50, the taxpayer was denied capital gain treatment as to declared dividends on stock held by him when those dividends were sold to a third party shortly before they became payable. In Fisher v. Comm'r, 6 Cir., 1954, 209 F.2d 513, the court held that the consideration received upon the sale of a corporation's notes which were in default both as to principal and interest was taxable as ordinary income, and not as capital gain, to the extent that the payment received exceeded the face value of the notes. And in Sorensen v. Comm'r, 1954, 22 T.C. 321, an opinion reviewed by the full court, the Tax Court held that stock options which were granted as compensation by the taxpayer's employer gave rise to ordinary income upon their sale, and not capital gain as taxpayer contended.

The recent Supreme Court decision in Commissioner of Internal Revenue v. P. G. Lake, Inc., 1958, 356 U.S. 260, 78 S. Ct. 691, 2 L.Ed.2d 743, sheds additional light on this area. Under review in that case were oil payment rights, and in one instance a sulphur payment right, which were assigned by the taxpayers for present considerations. The Court held that the amounts received for the assignments were taxable as ordinary income, subject to a depletion deduction, and not as long-term capital gains. Plaintiffs, however, urge a distinction as to the P. G. Lake case, saying that it is in accord with the long line of established authority which holds that a taxpayer cannot assign future income to another and thus himself escape the tax on that income. But here, plaintiffs contend, Elsa Wineman was not selling or assigning only future income: she sold her entire ownership in an income-producing capital asset and thereby relinquished forever all rights thereto. In answer to plaintiffs on this point, we are unable to agree that a transfer of the entire asset is dispositive of the case. Actually the law holds no certainty in this area, but the Supreme Court has indicated that the concept of "property" is not necessarily controlling in matters of taxation. In Hort v. Comm'r, 1914, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, the Court held that a sum received by a lessor for the cancellation of a lease was taxable as ordinary income despite the fact that the lease may for other purposes be treated as "property" or "capital". Since plaintiffs' asserted distinction is inconsistent with the principle of the Hort decision, we see no reason to adopt it.

This court is satisfied, after reviewing the above authorities, that the realized gain under the annuity contract in question should not be accorded capital gain treatment under section 117 of the Internal Revenue Code of 1939, but is properly taxable as ordinary income.[4]

The petition will be dismissed.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.

4. Of the $117,330.14 paid by the Penn Mutual Life Insurance Company upon surrender of the policy, $521.38 represented accumulated dividends and $329.02 represented interest on those dividends. Whether the dividends were paid out of earnings and therefore taxable when received, G. C. M. 10798, XI–2 Cum.Bull. 58, Florence Mae Shelley, 10 T.C. 44, or were merely rebates on premiums, and therefore not taxable under Treasury Regulations 111, Sec. 29.22 (a)–12 does not affect the result of this case. Thus if they are true dividends they are taxable for the year received (1951). But if they are rebates on premiums they are treated as a return of capital and thereby serve to reduce the taxpayer's cost basis. Hence, even though there is a reduction of the cost basis of the annuity, the taxpayer's gain is exactly the same as if the dividends were taxable.