309 F.2d 587
 62-2 USTC P 9807
 The FIRST NATIONAL BANK OF KANSAS CITY and Arthur Mag,
Executors of the Estate of Michael H. Katz, Deceased, and
the First National Bank of Kansas City and Arthur Mag,
Executors of the Estate of Rose B. Katz, Deceased, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
 No. 16975.
 United States Court of Appeals Eighth Circuit.
 Nov. 8, 1962.
 
 George E. Gibson, of Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., G. Lee Burns, Ernest M. Fleischer, Stinson, Mag, Thomson, McEvers & Fizzell, Kansas City, Mo., on the brief, for petitioners.
 Richard J. Heiman, Attorney, Tax Div., Dept. of Justice, Washington, D.C., Louis F. Oberdorfer, Asst. Atty. Gen., Washington, D.C., and Lee A. Jackson, Joseph Kovner and Arthur E. Strout, on the brief, for appellee.
 Before VOGEL and VAN OOSTERHOUT, Circuit Judges, and VAN PELT, district judge.
 VOGEL, Circuit Judge.
 
 
 1
 This is a petition for review of a decision of the Tax Court whereby there was held to be a deficiency of $22,687.64 in the income tax of Michael H. Katz and Rose B. Katz (both since deceased) for the taxable year of 1956.
 
 
 2
 Michael and Rose Katz were husband and wife residing in Kansas City, Missouri. They used the cash receipts and disbursements method of accounting and filing their income tax returns. Michael Katz was never a dealer in annuities, life insurance policies or securities.
 
 
 3
 In 1934 Michael Katz (hereinafter referred to as taxpayer or petitioner) purchased from the Equitable Life Assurance Society of the United States a Retirement Annuity Policy No. 9,564.624 for a single premium of $50,000. Taxpayer designated his wife and children as the beneficiaries of the policy, and elected a refund annuity beginning at age 70, one of the optional modes of settlement provided by the policy. Under such an election, the taxpayer would have received the monthly amount of $787.84 beginning on September 8, 1956. In addition to the provisions allowing for monthly annuities, the policy also provided for surrender of the policy any time before the due date of the first monthly annuity payment. The policy contained a schedule which showed the exact amount of the cash surrender value at the end of each policy year.
 
 
 4
 In addition the policy provided for the payment to policyholders of any divisible surplus. Such a payment could be received either as a dividend or apportioned to the policy and left to accumulate interest. Two such dividends were paid in 1935 ($104.50) and 1936 ($85.00) and the taxpayer chose to leave them with the company.
 
 
 5
 The policy was assignable with the assignee thereof having the same rights as his assignor. On August 23, 1956 (16 days before the due date of the first annuity payment) the taxpayer exercised his right of assignment by transferring the policy to the Mercantile Bank and Trust Company of Kansas City, Missouri. He received $97,200 for the policy. The cash surrender value on that date was $97,250 and the 1935 and 1936 dividends and interest thereon were valued at $352.01, or a total value of $97,602.01. The bank purchased the policy as an investment and by surrender of the policy on September 8, 1956, did realize a profit of $402.01.
 
 
 6
 The contention of the petitioner is that the $47,200 gain realized upon the sale of the policy was a capital gain and not ordinary income as contended by the government and held by the Tax Court.
 
 
 7
 There is little doubt that there was a 'bona fide' and not a 'sham' sale of the policy, and though there may have been a tax purpose involved therein, this by itself does not prevent the transfer from receiving capital gains treatment. See C.I.R. v. Phillips, 4 Cir., 1959, 275 F.2d 33, 35; Arnfeld v. United States, 1958, 163 F.Supp. 865, 867-868, 143 Ct.Cl. 277, certiorari denied, 369 U.S. 943, 79 S.Ct. 722, 3 L.Ed.2d 676. Additionally, there is little question but what the insurance policy itself constituted a capital asset. The Tax Court so held. This determination, however, does not resolve the case, for as said in Hort v. Commissioner, 1941, 313 U.S. 288 31, 61 S.Ct. 757, 758, 85 L.Ed. 1168:
 
 
 8
 '* * * Simply because the lease was 'property' the amount received for its cancellation was not a return of capital, quite apart from the fact that 'property' and 'capital' are not necessarily synonymous in the Revenue Act of 1932 or in common usage. Where, as in this case, the disputed amount was essentially a substitute for rental payments which 22(a) expressly characterizes as gross income, it must be regarded as ordinary income, and it is immaterial that for some purposes the contract creating the right to such payments may be treated as 'property' or 'capital."
 
 
 9
 See also C.I.R. v. Phillips, 4 Cir., 1959, 275 F.2d 33.
 
 
 10
 The major issue is, therefore, not whether the policy was a capital asset, but whether the gain realized thereon represented an appreciation of the capital asset itself, or rather represented income produced by such asset. For our purposes, the distinction seems well defined in Fisher v. Commissioner of Internal Revenue, 6 Cir., 1954, 209 F.2d 513, at page 514 where the court stated:
 
 
 11
 'We think the fundamental error into which the taxpayer has fallen is that he fails to distinguish, in respect to gains, between the status taxwise of an investor and a lender, or between seller and purchaser. It does not follow that because a transaction may be capial in its nature as to one it is necessarily capital as to the other. One who buys securities that are in default and later sells them at a profit realizes capital gain. One who receives income for the use of money or property or the performance of personal services is taxable upon such income. These propositions are, of course, elementary.'
 
 
 12
 See also Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 265-267, 78 S.Ct. 691, 2 L.Ed.2d 743; Tunnell v. United States, 3 Cir., 1958, 259 F.2d 916, 919; United States v. Snow, 9 Cir., 1955, 223 F.2d 103, 108-109, certiorari denied, 350 U.S. 831, 76 S.Ct. 64, 100 L.Ed. 741.[1] Here, it is quite plain that the $47,200 does not represent an appreciation in the value of the capital asset itself but is the total income earned by such asset during the period the insurance company held and used the $50,000 initial premium. Actually, there been treated as ordinary gain would have been treated as ordinary income if held to maturity and then surrendered for its face value. 26 U.S.C.A. 72(e)(1) expressly characterizes such as gross income. See also Chapin v. McGowan, 2 Cir., 1959, 271 F.2d 856, 858; Blum v. Higgins, 2 Cir., 1945, 150 F.2d 471, 474, 160 A.L.R. 1093; Avery v. Commissioner of Interal Revenue, 9 Cir., 1940, 111 F.2d 19; Arnfeld v. United States, supra.
 
 
 13
 Having decided that the gain realized on an annuity policy was ordinary income and not appreciated value of the capital asset, does the fact that the policy was transferred to a third party 16 days before maturity alter the character of the gain for tax purposes? The courts have uniformly held that it does not. In C.I.R. v. Phillips, 4 Cir., 1960, 275 F.2d 33, at pages 35-36, the court stated:
 
 
 14
 '* * * We believe, however, that we are required to adopt the view that since the amounts receivable upon maturity or surrender of the endowment policy unquestionably would have been taxable as ordinary income, the taxpayer may not convert such income into capital gain by a bona fide sale of the contract which is the means of producing such ordinary income. The cash value of the policy was equivalent to the reserve value which, in turn, was computed on the basis of three percent compound interest. The sale of the policy was, as said by Mr. Justice Douglas in Lake, 'essentially a substitute for what would otherwise be received at a future time as ordinary income'. Manifestly, the consideration paid by taxpayer's partners was 'not for an increase in the value of income-producing property."
 
 
 15
 The 5th Circuit made the following statement upon the contention that a 'transfer' is the only prerequisite for capital gains treatment, United States v. Harrison, 5 Cir., 1962, 304 F.2d 835, 837-838:
 
 
 16
 'The taxpayers hitch their wagon to a literalistic construction of the statutory term, 'in exchange therefor'. Under Section 1222(3) (of the 1954 Code, 26 U.S.C. 1222(3)) a long-term capital gain is defined as the 'gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income.' To qualify as a capital gain income must be received not merely in an 'exchange' but 'in exchange for a capital asset.' The fact that a gain is received in an 'exchange' is a prerequisite to capital gains treatment, but it does not by itself insure such treatment. When the right to receive ordinary income is sold, the proceeds from that exchange do not qualify for capital gains treatment.'
 
 
 17
 See also Commissioner v. P. G. Lake, Inc., 1958, 356 U.S. 260, 265-267, 78 S.Ct. 691, 2 L.Ed.2d 743; Hort v. Commissioner, 1941, 313 U.S. 28, 31, 61 S.Ct. 757, 85 L.Ed. 1168; United States v. Snow, supra; and Fisher v. Commissioner of Internal Revenue, 6 Cir., 1954, 209 F.2d 513, 514. It is manifestly clear that one cannot transform into capital gain what would have otherwise constituted ordinary income through the simple expedient of a sale or transfer.
 
 
 18
 Petitioner attempts to make much of the fact that the transfer herein was of the whole property, no right being retained by him. He also contends that the policy was a unitary and not a separable property. By such a contention he attempts to distinguish Commissioner v. P. G. Lake, Inc., supra; Hort v. Commissioner, supra; and Helvering v. Horst, 1940, 311 U.S. 112, 61 S.Ct. 144, 85 L.Ed. 75, in which only the right to income and not the supporting property was transferred. In Arnfeld v. United States, supra, which was also an annuity case, the taxpayers made an identical argument. The court answered the contention at page 870 of 163 F.Supp.:
 
 
 19
 '* * * But here, plaintiffs contend, Elsa Wineman was not selling or assigning only future income: she sold her entire ownership in an income-producing capital asset and thereby relinquished forever all rights thereto. In answer to plaintiffs on this point, we are unable to agree that a transfer of the entire asset is dispositive of the case. Actually the law holds no certainty in this area, but the Supreme Court has indicated that the concept of 'property' is not necessarily controlling in matters of taxation. In Hort v. Com'r, 1914, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168, the Court held that a sum received by a lessor for the cancellation of a lease was taxable as ordinary income despite the fact that the lease may for other purposes be treated as 'property' or 'capital'. Since plaintiffs' asserted distinction is inconsistent with the principle of the Hort decision, we see no reason to adopt it.'
 
 
 20
 We also agree that for tax purposes this is a distinction without a difference. There is no validity to the concept that the policy was a unitary piece of property incapable of division into its components. Certainly, there is no problem here in determining what is income and what is the basic capital asset.
 
 
 21
 Petitioner also relies on Bell's Estate v. Commissioner of Internal Revenue, 8 Cir., 1943, 137 F.2d 454, in which it was held that the transfer of a life interest in trust property gave rise to a capital gain rather than ordinary income. That decision rested in part upon the fact that it was not an assignment of income, but of income-producing property, making the case self-distinguishing. We do not have here the transfer of an equitable property interest capable of producing income, but the transfer of property (the policy), coupled with income already produced, namely, the $47,200 increment. As already stated, this is not an appreciation of the value of income-producing property, but rather of income produced by such property.
 
 
 22
 The petitioner additionally argues that the Arnfeld and Phillips cases are inapplicable because they were decided under the 1939 Code, 22(b)(2)(A), 26 U.S.C.A. 22(b)(2)(A). He points out that the 1954 Code 72(e)(1) differs from the 1939 Code in that it includes the words 'if no other provision of this subtitle applies' and thereby forces a referral to Subchapter P dealing with capital gains and losses. In other words, he argues that if the increment to the policy qualified for capital gain treatment, then Subchapter P precluded the application of 72(e)(1). But this is simply reiterating the very crux of the controversy. The addition is nothing more than an express statement of what has always been impliedly present. The Arnfeld and Phillips decisions also needed to consider the question of whether or not the capital gains section of the Code applied, and they remain sound authority upon that question. The defect in petitioner's circuitous reasoning is, simply, that no other provisions did apply.
 
 
 23
 Taxpayer finally contends that since his policy was with a mutual insurance company, the policy was analogous to an equity interest or preferred share and that the increment is similar to accrued but undeclared dividends. The Tax Court first points out:
 
 
 24
 'We are convinced that the gain realized by petitioner did not result from the appreciation in value of a capital asset, but was due to ordinary income produced by a capital asset. Petitioner contends that the earnings of the company on its investments, the mortality rates and many other factors affected the enhancement in value of the policy. However, the periodic increases in cash surrender value arose irrespective of such factors. To this extent, the annuity policy is analogous to an interest-bearing bond. The increase in cash surrender value of the policy accrues by reason of the passage of time and not by reason of earnings or other factors. In the instant case the gain was essentially the equivalent of interest and is taxable as ordinary income.'
 
 
 25
 The Tax Court then goes on to say that even if the petitioner's contention that policyholders here were the same as stockholders of a mutual company be true, the petitioner is in no better position, stating:
 
 
 26
 '* * * The increases in the value of the policy would be equivalent to dividends paid on stock and hence would still be ordinary income. Under petitioner's theory, there is little, if any, difference between his characterization of the situation and a person holding the preferred stock of a corporation which has a fixed dividend rate. Whether viewed as interest or dividends, the gain is still ordinary income and cannot be converted to capital gain by medium of sale.'
 
 
 27
 See Jaglom v. C.I.R., 2 Cir., 1962, 303 F.2d 847, 849, wherein the court stated:
 
 
 28
 'Similarly, if a taxpayer who owns common stock upon which a dividend has accured sells the stock and the right to the dividend, that part of the sales proceeds allocable to the sale of the right to the dividend is ordinary income. See Treas.Reg. 1.61-9(c); Brundage v. United States, 275 F.2d 424, 427 (7 Cir.), cert. denied, 364 U.S. 831, 81 S.Ct. 48, 5 L.Ed.2d 59 (1960); cf. Rhodes' Estate v. Commissioner, 131 F.2d 50 (6 Cir. 1942).'
 
 
 29
 The identical question we have before us in this case was also before the Tax Court in Roff v. Commissioner, 36 T.C. 818, affirmed June 4, 1962, 3 Cir., 304 F.2d 450. The Court of Appeals for the 3rd Circuit, after premising their affirmance mainly on the excellent opinion of the Tax Court, summarized at page 451 of 304 F.2d:
 
 
 30
 'Admittedly petitioner's gain arises from the fixed interest on the annuities. He would have been taxed on that gain as ordinary income had the contracts been surrendered or after their maturity. Section 72, Internal Revenue Code of 1954, 28 U.S.C. 72; cf. Bodine v. Commissioner, 103 F.2d 982, 983 (3 Cir. 1939), cert. den. 308 U.S. 576, 60 S.Ct. 92, 84 L.Ed. 483. Though petitioner had held these capital asset contracts for more than six months, what he received was the equivalent of interest on their sale. That sale cannot be held to '* * * convert what would in time constitute ordinary income * * * into capital gain.' Arnfeld v. United States, 163 F.Supp. 865, 869, 143 Ct.Cl. 277 (1958), cert. den. 359 U.S. 943, 79 S.Ct. 722, 3 L.Ed.2d 676. As was said in United States v. Snow, 223 F.2d 103, 108 (9 Cir. 1955), '* * * the assignment of accrued ordinary income must be treated separately from the assignment of the capital assets which produced the income."
 
 
 31
 Roff involved not only the sale of annuity policies shortly before maturity, but it was also decided under the 1954 Code and, additionally, involved annuities issued by a mutual insurance company. There is nothing in petitioner's contentions that is not fully answered in Roff and the cases preceding it.
 
 
 32
 Affirmed.
 
 
 
 [1]
 The factual situation in the Snow and Tunnell cases dealt with the sale of partnership assets. Petitioner here argues that the rationale of those cases should be rejected since this court held contra in United States v. Donoho, 8 Cir., 1960, 275 F.2d 489. All three cases were determined under the 1939 Code. The Donoho opinion expressly recognized that Congress, by the adoption of the 1954 Code, had resolved the problem through specifically declaring that the accounts receivable part of the partnership assets should be treated as ordinary income. 26 U.S.C.A. 702(b). Donoho, having been legislatively reversed by the 1954 Code, is distinguishable and of no help to petitioner herein
 Petitioner also contends that since Congress has seen fit to expressly mention the partnership situation (and also the bond issue present in Commissioner of Internal Revenue v. Caulkins, 6 Cir., 1944, 144 F.2d 482) that such enumeration would imply that annuity policies were not to be excluded from capital gains treatment. But as we have clearly seen there was decided conflict between the circuits upon the Donoho issue. The problem presented in Caulkins has also received a different solution in other circuits. See Rosen v. United States, 3 Cir., 1961, 288 F.2d 658; C.I.R. v. Morgan, 9 Cir., 1959, 272 F.2d 936. We have no such conflict in the annuity cases. It certainly can not be assumed that Congress intended to overrule the decisions concerning the annuity policies simply because it did not specifically endorse the decisions among which there was no conflict.