BRUCE G. MURPHY and LOU A. MURPHY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOSEPH L. LYLE, JR. and BARBARA S. LYLE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Murphy v. Commissioner
Docket Nos. 1550-77, 2565-77.
United States Tax Court
T.C. Memo 1980-218; 1980 Tax Ct. Memo LEXIS 366; 40 T.C.M. (CCH) 524; T.C.M. (RIA) 80218; June 24, 1980, Filed Bruce G. Murphy, pro se, in docket No. 1550-77. H. Calvin Spain, for the petitioner in docket No. 2565-77. John C. McDougal, for the respondent. FORRESTER
MEMORANDUM FINDINGS OF FACT AND OPINION FORRESTER, Judge: in these consolidated cases, respondent has determined the following deficiencies in petitioners' Federal income tax: Taxable
Docket No.
Petitioner
Year
Deficiency
1550-77
Bruce G. Murphy and
1972
$ 469.94
Lou A. Murphy
1973
7,887.64
2565-77
Joseph L. Lyle, Jr.
1972
1,457.20
and Barbara S. Lyle
1973
1,787.00
The only remaining issue to be decided is whether *367 monies received by petitioners with respect to certain transactions in 1972 and 1973 are to be treated as income from the sale or exchange of capital assets pursuant to sections 1221 [1] and 1222. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Bruce G. Murphy and Lou A. Murphy (petitioners in docket No. 1550-77) are husband and wife and resided in Virginia Beach, Virginia, at the time their petition was filed herein. Joseph L. Lyle, Jr., and Barbara S. Lyle (petitioners in docket No. 2565-77) are married and resided in Virginia Beach, Virginia, at the time their petition was filed herein. The petitioners in each docket number filed their joint Federal income tax returns for the years in issue with the Internal Revenue Service Center at Memphis, Tennessee. Both Lou A. Murphy and Barbara S. Lyle are parties herein only because of the joint returns they filed with their respective husbands, Bruce G. Murphy (petitioner or Murphy) and Joseph L. Lyle, Jr. (petitioner or Lyle, Jr.). From approximately *368 1967 to June 1974, Robert Dale Johnson (Johnson) operated a fraudulent pyramid or "Ponzi" type investment scheme to bilk would-be investors. The victims of this scheme were informed that Johnson had cornered the market on industrial wine [2] and that he owned purchase options on the industrial wine output of several European countries for which he had ready markets all over the world. He further assured the investors that purchasers for the wine were procured prior in time to the exercise of his options and that the wine was insured during shipment from the vineyards to its final destination. Johnson's victims were further told that their funds were needed at the time of purchase and that, once the wine was sold some eight or nine months later, their initial investment would be returned, together with a return of forty to sixty percent of the original investment. In point of fact, no industrial wine ever existed and the investments of new victims were used, not to purchase *369 wine as stated by Johnson, but to finance the returns of investment and high profits of earlier, less numerous investors, whose "contracts" were now due. In June 1974, Johnson's fraudulent scheme was exposed by the Securities and Exchange Commission and the "pyramid" of investments collapsed. In the fall of 1971, and in January and February 1972, petitioner Murphy was approached by Frank E. Mower, II (Mower), one of the innocent third-party middlemen working for Johnson, with reference to Murphy's participation in the purported "wine investments." Some time prior to February 22, 1972, petitioner Lyle, Jr., was similarly approached by Mower. The transactions proposed by Mower each involved the investment of a sum of money with a company known as Portugal Wines, Ltd. (PW), in exchange for which petitioners would receive an "investment contract." Said contract acknowledged their investment and provided for a maturity date, approximately eight or nine months thereafter. The representation made by Mower to Murphy and Lyle, Jr., was that PW would use their investments to purchase Portuguese wine for resale and that, on the stated maturity date, their investments would be returned *370 with an additional amount equal to approximately 50 percent of their original investments, depending upon the sales price obtained for the wine. Both Murphy and Lyle, Jr., were assured by Mower that the promoters of the venture had received an opinion from a law firm that such gains would be treated as long-term capital gains for the years in issue by the Internal Revenue Service. The "wine contract" entered into by Murphy is reproduced in full below. It is identical to the one entered into by Lyle, Jr., except that the amount of the contract is $8,000 and the maturity date is November 22, 1972. PORTUGAL WINES, LTD. This is to certify that Bruce G. Murphy has entered into an investment contract with Portugal Wines, Ltd., in the amount of $12,500.00. This contract to mature on or about October 22, 1972. J. O. Friedman J. M. Holt, Jr. Throughout 1972 and 1973 Murphy and Lyle, Jr., made cash investments and received returns on those investments as follows: Petitioner-
Investment
Maturity
Cash
Investor
Date
Date
Investment
Murphy
2/22/72
10/22/72
$12,500
Murphy
1/2/73
10/3/73
30,000
Murphy
2/12/73
12/13/73
25,000
Lyle, Jr.
2/22/72
11/22/72
8,000
Lyle, Jr.
4/4/72
12/18/72
7,000
Lyle, Jr.
5/18/72
2/6/73
4,000
Lyle, Jr.
1/3/73
10/5/73
15,000
*371 Cash
Percentage
Petitioner-
Cash
Return
Return on
Invesntor
Return
Date
Investment
Murphy
$18,500
11/17/72
48
Murphy
42,000
10/3/73
40
Murphy
33,250
12/13/73 *
33
Lyle, Jr.
12,000
11/22/72
50
Lyle, Jr.
10,500
12/18/72
50
Lyle, Jr.
6,000
2/6/73
50
Lyle, Jr.
21,000
10/5/73
40
On their Federal income tax return for 1973, the Murphys reported $20,250 as capital gains with respect to the investment contracts. They also reported on that same year's return $5,500 as capital gains with respect to the February 22, 1972, investment contract. The $6,000 the Murphys received from Mower on November 17, 1972, should have been reported on their 1972 Federal income tax return but was not. Instead, $5,500 ($6,000 received in 1972 and $500 returned to Mower in 1973) was reported in 1973. With respect to their Federal income tax return for 1972, the Lyles reported $7,500 as capital gains with respect to the investment contracts. For 1973 they reported $6,000 as capital gains on *372 their Federal income tax return, but omitted $2,000 in capital gains from the investment contract which matured on February 6, 1973. In his statutory notices of deficiencies respondent determined that the "wine transactions" in 1972 and 1973 did not result in the acquisition, sale, or exchange of capital assets. He, therefore, decreased petitioners' reported capital gains and treated the gains realized from the transactions as ordinary income. OPINION Respondent contends that petitioners are not entitled to capital gains treatment on the income realized from the investment transactions hereunder because the "wine contracts" are not capital assets and because no sale or exchange occurred with respect to such contracts. To the contrary, petitioners argue that the "wine contracts" were capital assets and that a valid sale or exchange accompanied each contract. It is well settled that in order for profits to be adjudged capital gain, petitioners have the burden of proving (1) that the property in question was a capital asset, and (2) that there has been a sale or exchange of that property. See Dobson v. Commissioner,321 U.S. 231 (1944). Therefore, petitioners *373 must carry the burden of showing error in respondent's determination. Rule 142(a), Tax Court Rules of Practice and Procedure; Lewis v. Reynolds,284 U.S. 281, 283 (1932). Capital assets are defined in a negative manner under section 1221. [3] Said section generally provides that the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business) but does not include stock in trade, property includable in investory, or for sale to customers, or subject to the allowance for depreciation, etc. The sale of a capital asset, if held for a statutorily designated period of time, is given the preferential tax treatment of long-term capital gains and for this reason the Supreme Court has repeatedly held that the definition of a capital asset must be construed narrowly. See, e.g., Commissioner v. Brown,380 U.S. 563 (1965); Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955). *374 It is petitioners' position that they have purchased either some form of a commodity (wine) futures contract, or, at the very least, a contract right to future uncertain profits. An examination of the "contract" belies either position. This document, which is reproduced in full in our findings, shows only a bare recitation that petitioners had entered into an investment contract with PW for a specified dollar amount and for a given maturity period. No quantity of any commodity or any property, tangible or intangible, is named; nor is any type of commodity or property specified; nor does the document indicate that the investor is acquiring any given interest in any property or in PW.In essence, we are unable to determine from the record hereunder what rights, if any, petitioners had either in PW or in any proceeds that they had been led to believe would result from their investment. In a case remarkably similar on its fact to the one at hand, Harris v. United States,431 F. Supp. 1173, 1178 (E.D. Va. 1977), the court found that the investor had obtained interests in nothing more than a puff of smoke and that such interests were not "capital assets" as Congress *375 had intended that meaning under section 1221. So it is in the case at hand. No evidence in this record will satisfy petitioners' burden. The parties stipulated at trial that the evidence proferred in a companion case, Fox v. Commissioner,T.C. Memo. 1980-198, was to be part of the record herein. In that case the petitioner introduced broker confirmation slips which enumerated the purchase and sale of live cattle, arguing by analogy, that the PW investment contract represented a commodity futures contract. As we found in Fox,supra, such a comparison was utterly deficient because the confirmation slips designated a named commodity (live cattle) and an exact amount of that commodity. Thus, it appears that in the instant case, as in both Harris and Fox,supra, petitioners have purchased mere wisps of smoke. Perhaps recognizing the deficiency inherent in such a comparison, petitioners have chosen to assert, as their principal argument on brief, that they have indeed purchased a contract right to share in the future uncertain profits of PW. Such an assertion is as equally unconvincing as the futures contract analogy.
*376 In the instant case, there is no ephemeral right which attaches to the profits of PW and somehow alters the document from its present state to an item of property within the general definition of a capital asset. On the contrary, petitioners paid their monies and received pieces of paper, which were denominated by them as "wine contracts." They just as properly could have labeled them "wine barrel contracts" since what the pieces of paper represent is so equivocal that it is incongruous to argue that they manifest an intent by the parties for petitioners to share in the future uncertain profits of PW. Petitioners further argue that the underlying capital asset in their transactions with PW was not the wine, but rather, the contractual right created by the investment contracts per se. While it is true that contract rights are generically deemed to be property rights, whether they are "property" for section 1221 purposes, however, may be another matter. Arnfeld v. United States,143 Ct. Cl. 277, 163 F. Supp. 865 (1958). To make this determination, we must view the nature of the income that will result from the contract. Whatever petitioners received for their *377 funds, it is clear from the evidence in the record that it was not a right to future profits. The transactions were not built around a direct and completed transfer of stock. Cf. Kaplan v. Commissioner,66 F. 2d 401, 403 (1st Cir. 1933). Petitioners are not "investing" in PW as much as advancing funds, at an unstated interest rate, to PW. It has been held that interest may be measured by a proportion of profits, and the payment by PW to petitioners of a proportionate share of its profits does not change the character of this compensation. See Kena, Inc. v. Commissioner,44 B.T.A. 217 (1941). Since the contracts hereunder are more properly reflected as debt instead of equity, the nature of the income that results from such contracts must be ordinary income in nature to the extent it represents an unstated amount of interest. See Estate of Nordquist v. Commissioner,481 F. 2d 1058 (8th Cir. 1973), affg. a Memorandum Opinion of this Court. The remaining cases cited by petitioners are inapposite because they either support the contention that investment certificates issued by investment companies are capital assets or that a substantial *378 investment motive is controlling in determining whether stock acquired in a corporation is a capital asset. Neither contention fits petitioners' case. Based upon the entire record, we conclude and hold that petitioners have not carried their burden of proving that the agreements they individually entered into with PW were capital assets in their hands. Having decided that petitioners did not hold capital assets, we need not, and do not, decide whether petitioners' receipts from PW, via Mower, resulted in a sale or exchange. Decision will be entered for the respondent. Footnotes
1. Unless otherwise specified, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
2. The term "industrial wine" denotes the use of wine which, inter alia, has been rendered unfit for beverage use, viz, cooking wines, salad dressings, etc. See, e.g., 27 C.F.R. sec. 2.11↩(d) (1979).
*. Murphy paid Mower $500 on 12/13/73 representing an excess payment to Murphy from Mower on 11/17/72 with respect to the 2/22/72 "investment contract."↩
3. SEC. 1221. CAPITAL ASSET DEFINED. For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business), but does not include-- (1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business; (2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business; (3) a copyright, a literary, musical, or artistic composition, a letter or memorandum, or similar property, held by-- (A) a taxpayer whose personal efforts created such property, (B) in the case of a letter, memorandum, or similar property, a taxpayer for whom such property was prepared or produced, or (C) a taxpayer in whose hands the basis of such property is determined, for purposes of determining gain from a sale or exchange, in whole or part by reference to the basis of such property in the hands of a taxpayer described in subparagraph (A) or (B);↩