**GRINNELL CORPORATION**

v.

**The UNITED STATES.**

**No. 446–59.**

United States Court of Claims.

Feb. 16, 1968.

William E. Jackson, New York City, for plaintiff. Weston Vernon, Jr., attorney of record. Stuart E. Keebler, Adlai S. Hardin, Jr., and Milbank, Tweed, Hadley & McCloy, New York City, of counsel.

Burton G. Ross, Washington, D. C., with whom was Asst. Atty. Gen., Mitchell Rogovin, for defendant. Philip R. Miller, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

## OPINION

PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57 (a). The commissioner has done so in an opinion and report filed on January 27, 1967. Exceptions to the commissioner's findings of fact and recommended conclusion of law were filed by plaintiff and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's findings, opinion and recommended conclusion of law, with the omission of one footnote, it hereby adopts the same as modified as the basis for its judgment in this case.

Therefore, plaintiff is not entitled to recover and the petition is dismissed.

Commissioner Gamer's opinion as adopted by the court (i. e., omitting one footnote) is as follows:

After the payment of its 1954 and 1955 income taxes in regular course, plaintiff was, in 1957, assessed additional income taxes for such years which plaintiff paid, plus interest thereon. Plaintiff contested the assessments and, upon the rejection of its claims for refund of such additional payments, instituted suit here for their recovery in the amount of over $915,000, plus interest. The issue is whether certain amounts which plaintiff received during those years are taxable, under the Internal Revenue Code of 1954, as long-term capital gains resulting solely from the sale of capital assets, as claimed by plaintiff, or as ordinary income, as asserted by defendant.

An understanding of the true character of the monies here in issue requires a presentation of the events leading up to their payment to plaintiff.

Prior to 1904, one McElroy pioneered in developing and inventing certain electrical signaling devices which, when properly attached to automatic sprinkler systems, would detect the flow of water therein. Such sprinkler systems, as installed in premises, are designed to provide an automatic flow of water to extinguish fires. However, with the McElroy electrical signaling devices attached to the system, the flow, usually signifying the presence of fire, would be detected by a device which would actuate a transmitter, to which it would be wired. The transmitter would then send, over leased telephone wires, electric signals to a remote central station where they would be recorded on specialized equipment. This station, operating on a 24-hour-a-day basis, would then, after properly interpreting the signal, take immediate steps to notify the firefighting authorities and the owner or occupant of the premises. These devices would also transmit signals when various defects or malfunctions in the system were indicated, such as loss of water pressure or freezing water temperatures, which would prevent the sprinkler system from functioning properly in the event of a fire.

At that time, the American District Telegraph Company (ADT) was already in the business of providing various types of electric protection services through central stations, including fire and burglar alarm services. On February 18, 1904, McElroy and ADT entered into a 50-year contract relating to the providing by ADT of the type of central station fire alarm service which his devices would make possible, such service being called "sprinkler supervisory and waterflow alarm service". The arrangement was for McElroy to solicit throughout the United States, in his own name, subscribers for such service (such subscribers for the most part already having automatic sprinkler systems installed on their premises), and to have manufactured and to furnish and deliver to ADT, the actuating and transmitting devices. ADT would then install, maintain and operate the devices, provide the supervisory central station service, and collect the service charges from the McElroy subscribers. For these services, ADT would be entitled to retain 55 percent of the receipts from the customers. The contract contained provisions designed to prevent competition between the parties in their respective spheres of operation, and to prevent either party from contracting with anyone else for similar services. Shortly thereafter, McElroy formed the Automatic Fire Protection Company (AFP), of which he became president, and to which he transferred, with ADT's consent, all of his interests in the ADT contract.

During this period the business of plaintiff (then called the General Fire Extinguisher Company) included manufacturing, selling and installing automatic sprinkler systems throughout the United States. It had the means to produce, or to cause to be produced, as well as to install, the McElroy actuating devices on such sprinkler systems.

There also existed at this time a company, the Automatic Fire Alarm Company (AFA), which was engaged in central office fire alarm operations in New York City, Boston, Massachusetts, Charlestown, Massachusetts, and Philadelphia, Pennsylvania (sometimes hereinafter referred to as the "four cities").

On April 29, 1907, there were simultaneously executed two agreements to which plaintiff was a party, as follows:

One agreement (hereinafter sometimes referred to as the first 1907 agreement) was between plaintiff, ADT, and McElroy's company (AFP) and related to the supervisory fire alarm business throughout the United States. Under this agreement plaintiff took over from AFP (after paying AFP $85,000) the responsibility of furnishing, and from ADT the responsibility of installing, the McElroy actuating devices. AFP was to continue to furnish the transmitters and to solicit the business in its own name. ADT was to perform the balance of the service, i. e., install the transmitters and all necessary wiring, provide the central station supervisory service, and collect the service charges from the customers. For its contribution and services under the contract, ADT was entitled to retain 50 percent of such service charges. Both plaintiff and AFP were to receive 25 percent each.

Plaintiff and AFP were required to maintain, repair and replace the devices they furnished but only up to a total expenditure of $5,000 each (exclusive of defects attributable to faulty material, poor workmanship or improper assembly) an amount which was reached within a few years after 1907. Thereafter ADT was required to assume such obligation. However, even though it was ADT who assumed the replacement obligation and bore all subsequent maintenance and repair costs with respect to such devices, plaintiff and AFP continued to receive their 25 percent shares of the subscriber service charges.

Plaintiff and AFP (but not ADT) had certain rights to cancel this agreement, in which event the 1904 McElroy-ADT agreement would be revived.

The other agreement (hereinafter sometimes referred to as the second 1907 agreement) was between the same three parties plus AFA[1] and related to the supervisory fire alarm business in only the four cities in which AFA operated. Thus, it modified the first agreement with respect to the activities of the parties within such cities. The agreement in effect novated AFA, within the four cities, to the right, title and interest of AFP under the first agreement.[2] In all other respects, it was substantially similar to the first agreement. Thus, in such cities it was AFA who sold, and made contracts with subscribers for, the supervisory service, and also supplied the transmitters, receiving 25 percent of the contract receipts, with plaintiff and ADT performing the same services as under the first agreement and receiving the same percentages of the receipts, i. e., 25 percent and 50 percent, respectively.

Both 1907 agreements, as did the 50-year February 18, 1904 agreement, expired by their terms on February 18, 1954. The agreements were regarded by the parties as superseding the 1904 agreement. They too contained provisions whereby the parties agreed to cooperate and aid in the upbuilding and growth of their respective interests, which they considered as including agreements not to compete with each other in their respective spheres of operation as well as not to contract with anyone else

---

1. Two other companies, the Consolidated Fire Alarm Company of New York and the Boston Automatic Fire Alarm Company were also parties, but their presence as such is unimportant for present purposes. Their interests were subsequently acquired by AFA by consolidation.

2. Under this second 1907 agreement, ADT and AFA sometimes exchanged or reversed positions, except for the service-selling activity, which AFA always performed.

for the services delineated by the agreements.

Through the years, the supervisory fire alarm service business covered by the 1907 agreements grew and contributed greatly to the stability and prosperity of the parties. Plaintiff, a leading seller of automatic sprinkler systems, was in a unique position to recommend and promote, by commissions to its employees and otherwise, the sale of ADT's supervisory central station service. Not only would it be the supplier of the actuating devices, but it would also be the recipient of 25 percent of the contract revenues for as long as the subscriber took the service. The average life of a supervisory fire alarm service contract, including renewals, is approximately 20 years (the contracts were written for five-year terms). It was the income from this source, when its other lines of business (the manufacture of piping, pipe fittings and hangers, valves, and iron and brass foundry products) suffered, which substantially helped plaintiff to weather the depression. From 1907 through February 18, 1954, plaintiff realized gross receipts under the 1907 agreements of almost $28,000,000. And ADT became by far the largest company in the country in the central station protective business.

In 1913, ADT and AFP entered into a contract (to which plaintiff was not a party) whereby ADT took over AFP's obligations under the first 1907 agreement in return for which AFP assigned to ADT (in consideration of payments by ADT of $900,000 a year for 10 years) a substantial portion of AFP's 25 percent share of the customer receipts. From then on AFP practically dropped out of the picture so far as being an active participant in contract operations was concerned. The contract also provided that at the February 18, 1954 expiration date, each would be entitled to one-half of all the service contracts then outstanding (as well as one-half of all the supervisory service materials then installed in the premises of subscribers).

Because of the relatively complex nature of the 1907 agreements and the interrelationships between the participants created thereby, the parties recognized the necessity of knowing well in advance of the February 18, 1954 expiration dates what the situation would be thereafter. The agreements themselves did not spell out what, as the parties phrased it, their "terminal rights" would be in the event of a failure to renew. Accordingly, as early as 1945, plaintiff and ADT initiated discussions. They agreed to negotiate first with respect to the first 1907 agreement covering the entire United States (except the four cities) and then to use any agreement arrived at as a possible basis for negotiations (which would have to include AFA) with respect to the second 1907 agreement covering only the four cities.

Initially, the discussions were based on the assumption of a renewal or extension of the agreement upon which the parties' profitable association over so many years had been based. The major obstacle during this stage of the negotiations was ADT's insistence that plaintiff's 25 percent revenue participation was too high. ADT felt it was disproportionate to plaintiff's total investment in the business, which, according to ADT, consisted almost entirely of the actuating devices. ADT's early suggestions of an appropriate participation were approximately four or five percent, which later, however, rose to 12½ percent and finally to 15 percent. Plaintiff indicated it would be prepared to consider a renewal rate that would be lower than 25 percent, but not as low as 15 percent. In this connection, there was extended discussion as to the proper basis for determining plaintiff's investment. Valuation theories based on "replacement cost", "historic cost", and a hypothetical selling price of the installed devices, were all discussed. The last method prompted ADT to suggest that it might actually consider purchasing the devices. Plaintiff construed this as in effect constituting a suggestion that the parties' long association be terminated, with ADT being in sole possession of the business. Its reaction to the suggestion was distinctly negative. It stated that it considered itself as being

in the supervisory fire alarm service business, that it was in such business to stay, and if it could not remain in it in the years beyond 1954 by reaching a renewal agreement with ADT, it would be obliged, by establishing its own central stations, to enter the business itself. It further stated, however, that it preferred instead to work out a satisfactory renewal arrangement.

This discussion, followed by others in which ADT continued to make suggestions which included ownership of the devices by ADT, and which were again interpreted by plaintiff as evidencing a desire by ADT to sever its relationship with plaintiff, inevitably led to a reappraisal of what the parties' basic relationship was under the agreement and what their terminal rights would be if no renewal agreement could be consummated. Plaintiff contended that ADT was in error if it felt that plaintiff's only relationship to the business was that of a vendor of materials, i. e., the actuating devices, which ADT could terminate by simple purchase of such materials. Emphasizing the contract provision whereby the parties agreed to give each other aid "looking toward the upbuilding and growth of their respective interests", plaintiff argued that, properly construed, the agreement created an arrangement in the nature of a partnership, a conclusion reinforced by the contract provision for plaintiff's substantial participation in the gross revenues. And plaintiff asserted that it had contributed to the partnership relationship in many ways other than by simply supplying actuating devices, such as (1) its use of its strategic position as seller and installer of sprinkler systems to promote ADT's supervisory service, (2) its taking special steps, when installing a sprinkler system, to coordinate the installation with the type necessary for satisfactory supervisory service, (3) its continuing research and development program for improved actuating devices, which enabled ADT to give better supervisory service, and (4) its strict observance of its obligation not to compete with ADT in the supervisory fire alarm business.

Plaintiff did state, however, that if ADT decided that, upon the expiration of the 1907 agreements, it no longer desired plaintiff as a partner, plaintiff would consider selling to ADT all of the installed actuating devices outside of the four cities provided, however, and consistent with plaintiff's determination to remain in the business at least to some extent, ADT would sell to plaintiff ADT's entire central station business within such cities (which included electric protection service other than fire alarm service, such as burglary). On this basis, plaintiff was willing to agree, for a specified period, not to compete with ADT outside the four cities. However, ADT rejected this proposal, whereupon plaintiff, again on the supposition that ADT wished to terminate their relationship, further proposed to sell to ADT the installed devices outside the four cities if ADT would sell its equipment within the four cities which related only to the supervisory fire alarm business. Since plaintiff's income on this basis would be more restricted, plaintiff refused, under this proposal, to continue to observe any noncompetition arrangement with ADT. This proposal too was rejected by ADT.

ADT then assured that plaintiff was misconstruing its position, that it was not unmindful of the various contributions, both tangible and intangible, that plaintiff had made to the overall welfare of the business, and that it was not contending, nor was its suggestions for the purchase of the actuating devices properly to be construed as a contention, that such physical devices constituted plaintiff's sole contribution to the business (although ADT insisted that its own contributions to the welfare of the business, both tangible and intangible, and which, as did plaintiff's, went beyond the letter of the 1907 agreements, were at least equal to plaintiff's). ADT then suggested a 20-year extension of the agreement with plaintiff to participate on some basis which would be less than 25 percent but which would nevertheless reflect recognition of plaintiff's intangible contributions. It again suggested, however, that at the end of the

20 years, ownership of the installed devices should be transferred to ADT.

The early discussions to the effect that the division of the contract revenues should bear some relationship to the amount of the parties' financial investment in the business envisioned a determination, upon some appropriate basis, of the amount of plaintiff's investment, and it was at that time tentatively agreed that representatives of both companies would cooperate in the computation thereof, the basic figures for which would necessarily have to come from plaintiff's books and records. However, this plan was now frustrated by plaintiff's refusal to open its books for the inspection of the ADT representatives. Plaintiff concluded there was no reason for it to permit ADT to inspect its books until ADT first definitely concluded whether it wanted to continue their, as characterized by plaintiff, "partnership" association, and throughout the lengthy negotiations ADT was never successful in obtaining from plaintiff the necessary book figures.

However, ADT did, on the basis of its own knowledge and experience, attempt to estimate such figures, and used such compilation in further negotiation sessions. These figures, among other things, deducted from plaintiff's estimated total investment in the actuating devices the value (approximately $535,000) of the ADT devices which, under the 1907 agreement, ADT was committed to replace after plaintiff's original $5,000 obligation had been met. Recognizing the difficulties, however, in determining exactly which devices, out of a total of approximately 120,000, belonged to ADT and which to plaintiff (it was felt it would take a lawsuit to determine this question) and to avoid in the future, when negotiations might possibly again take place at the expiration of such renewal agreement as the parties would possibly work out, any similar problems arising out of the dual ownership of the devices, it was agreed that plaintiff should, as the installer of all the devices (including those for ADT's account), similarly own them all and also be re-sponsible for all of the maintenance and repair work.

Thus, in June 1950, and after some five years of bargaining plaintiff finally offered to enter into a contract extension of 20 years (the period which ADT had also suggested), with, however, (1) plaintiff participating in only 23½ percent of the customer receipts, (2) plaintiff purchasing the ADT replacement devices at ADT's own valuation figure of $535,000, and (3) plaintiff thereafter assuming full responsibility for all device maintenance, repair, and replacement.

Meanwhile as the negotiations proceeded, and with the question of the possibility of arriving at a renewal agreement uncertain, the parties took various steps to strengthen their positions. In 1949 plaintiff took over control of AFA, purchasing approximately 76 percent of its outstanding capital stock, thus giving it an entering wedge for direct participation in the central station business. During that same year, ADT acquired all of AFP's remaining rights in the first 1907 agreement for $13,500,000, payable in 15 annual installments of $900,000 each, thus taking over completely AFP's share of the contract revenues as well as AFP's interests in the subscriber contracts and the installed materials. These $900,000 installments were still less than the amount of the reduced annual payments ADT had been making to AFP under the first 1907 agreement, as amended in 1913. And in April 1950, plaintiff further demonstrated its determination to remain in the central station service business by purchasing all of the outstanding common capital stock of the Holmes Electric Protective Company which, through central stations, was in the business of furnishing burglar and holdup alarm service (but not sprinkler supervisory fire alarm) in New York City, Philadelphia and Pittsburgh. This company was the largest seller of such service in the New York and Pittsburgh areas.

In 1950, after plaintiff made its 20-year renewal offer on the bases above set forth, and with an extension agree-

ment substantially along such lines apparently in the making, a new serious obstacle arose. ADT counsel expressed doubts concerning the validity, under the antitrust laws, of any extension or renewal of the 1907 agreements. They finally concluded, for various reasons, that the agreements already in existence, as interpreted and given effect by the parties, violated such laws and that therefore any extension thereof in the form of the proposals previously discussed would necessarily also be invalid. They accordingly refused to sanction ADT's entering into any such renewal or extension agreement.[3]

Plaintiff's counsel strenuously disputed the antitrust conclusions and contentions of ADT counsel. Among other things, they argued, in an elaborate written presentation, that the proposed renewal would not constitute a prohibited type of exclusive dealing arrangement because the Clayton Act spoke in terms of a sale, a contract to sell, or a lease, whereas, in their opinion, no sale of the actuating devices was involved, because, in addition to the fact that under the parties' long-agreed-upon interpretation of the 1907 agreement plaintiff retained title to the devices, the revenues received by plaintiff could not "in the ordinary sense of the word be considered a price for any specific devices furnished". The revenue plaintiff received, they argued, "even taken on a job-by-job basis, is never directly related to its cost of furnishing and installing the actuating devices as a normal commercial price would be." They pointed out that such revenues were the same whether a particular installation required simple, inexpensive devices, or more expensive types (the shelf price of such devices ranged from $15 to $85). And an additional reason which they stressed as to why the revenues bore no relationship to the costs involved of furnishing and installing the devices, which, they said, would constitute the normal basis for fixing a price, was that plaintiff's total revenue under a subscriber's contract was dependent upon the length of time the contract would last, a matter largely outside the control of either plaintiff or ADT. For instance, if the subscriber's contract terminated after only one year, plaintiff's share of the revenues might well be insufficient even to defray its out-of-pocket costs in installing, removing, and reconditioning the devices. However, if the contract lasted for 15 years or longer, "Grinnell's total revenue might be quite substantially in excess of its costs or of what would have been a commercial price for furnishing and installing the devices." And for the same reasons they argued that, considering "the substance and not the form", the arrangement did not constitute a lease either since again there was "no specific term" and no "specified 'rental' in the ordinary sense", the "rental" bearing "no direct relationship to either the cost or value of the items 'leased'". The "true nature of the arrangement" between plaintiff and

---

3. ADT counsel pointed to the noncompetitive arrangement between the parties, as well as their dealing exclusively with each other. They were fearful that ADT, controlling, as it did, about 80 percent of the country's supervisory fire alarm service business (and therefore itself very probably constituting a monopoly) was, in acquiring the actuating devices exclusively from plaintiff, withdrawing from competition for an abnormally long period the supply of 80 percent of the market for the devices. Furthermore, they felt that the tie-in between plaintiff's sprinkler business and its interest in the supervisory fire alarm service business gave plaintiff a source of revenue not available to its competitors.

Plaintiff could, they argued, well be in a position to underbid on sprinkler installation contracts because it could, if the subscriber also took ADT's supervisory service, which plaintiff recommended and promoted, make up the underbid by its sharing in the receipts under the ADT contract. Plaintiff's competitors had complained that plaintiff's relationship with ADT had enabled plaintiff to compete unfairly.

At least insofar as ADT counsel's fears were based upon monopoly considerations, they turned out to be well grounded. See *United States v. Grinnell Corp. et al.,* 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966).

ADT, they once more concluded, was that of a "joint venture" in the nature of "a partnership or quasi-partnership", and "not an arrangement under which Grinnell would simply be a commercial vendor to ADT of certain equipment Grinnell was prepared to manufacture and sell". Plaintiff's total part in the venture was, they argued, not only to furnish and install all the devices but also "to furnish a number of additional services * * * along the lines of research, development, design, technical advice and assistance, promotion of central office business, and general co-operation."

However, ADT counsel remained unconvinced and adamant.

With this development, the question then arose as to what would happen on February 18, 1954, when the existing agreements would expire, the discussion centering upon the parties' terminal rights. Plaintiff grounded its rights on its partnership or joint venture theory, contending that McElroy was the one who originally owned the entire business, with ADT being simply employed to perform certain services, and that, by the 1907 agreement, McElroy took plaintiff in as a partner, a relationship that would continue until 1954, at which time plaintiff and McElroy (AFP) would own the entire business, each entitled to a 50 percent interest, and with ADT entitled to nothing. Since plaintiff was not a party thereto, it questioned the binding nature, as to it, of ADT's 1913 and 1949 agreements with AFP purportedly substituting ADT for AFP as plaintiff's partner, but argued that in any event plaintiff would still have a 50 percent interest in the entire business as of February 18, 1954.

ADT rejected this analysis and the parties seemed unable to agree on their terminal rights. Finally ADT stated that since a renewal agreement could not be made, and seemingly no terminal rights agreement could be reached, it felt that discussions were in order concerning a purchase by ADT of plaintiff's actuating devices so as to insure the continuance of customer service without interruption on February 18, 1954. ADT's fear was that plaintiff might, on the expiration date, attempt to remove all of its actuating devices from customer premises throughout the country. Unless a huge simultaneous removal and replacement program were coordinated, an extremely complex operation, serious service disruptions would necessarily result. However, plaintiff responded that such a sale of the devices would not resolve the problem of plaintiff's total terminal rights under the contract which, under plaintiff's theory, amounted to 50 percent of the entire business and its assets. Thus did the negotiations, in late 1950, reach an impasse.

Shortly thereafter in 1951 ADT, guarding against the possibility of plaintiff's removal of its actuating devices on February 18, 1954 on subscribers' contracts covered by the 1907 agreement, as well as to enable it to handle the new business after such date, commenced preparations to manufacture and install its own devices.

Almost a year passed before the parties met again, and when they did, in late 1951, they found themselves still unable to agree. Plaintiff, again refusing to accept compensation for its actuating devices as a satisfaction of its contract terminal rights, reiterated its determination to remain in the supervisory fire alarm service business (admitting that its acquisitions of AFA and Holmes were directed to that end). It further stated that it proposed to stay in the business through the 1907 agreements because, it concluded, it was clearly entitled, as a contract right, to a continued 25 percent revenue participation from all subscribed contracts in force on February 18, 1954 for the duration thereof, including any renewals. Those contracts, plaintiff contended, having been written prior to such termination date, would be covered by the agreement and be subject to the terms thereof.

Plaintiff's last approach seemed to open up a new avenue of possible settlement. For one thing, it would assure plaintiff, considering the relatively long

terms of the subscribers' contracts, continued substantial participation in contract revenues for an extended period of time. It would take approximately 20 years before all the subscribers' contracts covered by the 1907 agreements would be closed out, a period of time equivalent to the length of the proposed extension or renewal agreements that had been discussed. In addition it was a reasonable and logical approach since it could hardly have been the intent of the authors of the 1907 agreements that, lacking a renewal agreement, plaintiff would nevertheless be obligated to make substantial installation investments right up to the February 18, 1954 expiration date without ever having the opportunity of recouping at least its costs.

Shortly thereafter, at a meeting on February 19, 1952, ADT suggested that the parties first attempt to compose their differences with respect to subscribers' contracts covered by the first 1907 agreement along the lines suggested by plaintiff at the last meeting, and then later take up what the parties' relationship, if any, would be with respect to new business written after February 18, 1954. On such old business ADT agreed to continued participation by plaintiff at some agreed percentage (still insisting, however, that 25 percent was too high) but on condition that the percentage should apply throughout the term of the subscriber's contract frozen at the scale of contract revenue in effect on February 18, 1954, and regardless of any subsequent rate increases or decreases. Plaintiff indicated a willingness to consider this approach as well as a reduction of its participation to 20 percent. Thus did it seem at last that an agreement was possible.

Before finally committing itself, however, plaintiff retained eminent outside counsel to make a detailed study of the 1907 agreements, the relationships created thereby, and the terminal rights of the parties thereunder. Such counsel concluded (1) that the relationships created were those of a partnership or joint venture, and (2) that plaintiff's rights and obligations with respect to subscribers' contracts covered by the agreements would not abruptly terminate on February 18, 1954, but would continue as long as the service contracts did, plaintiff's obligation being to permit its actuating devices to remain in service for such periods, but with plaintiff having the correlative right to continue to receive 25 percent of the revenues from such service contracts. However, after February 18, 1954, no new service contracts could be brought under the agreements. These views coincided with those of plaintiff's regular counsel. This solution also had practical advantages. For one thing, it solved the continued-service problems that would flow from the "abrupt-termination" theory, as well as the problem of who would own the subscribers' contracts as of February 18, 1954. Under the "continuing rights and obligations" theory, such ownership problem would become unimportant because the service contracts would continue until they expired, at which time no one would care who had owned them.

Plaintiff thus finally decided that it would be willing to compose its differences with ADT on the general basis of the discussions had at the February 19, 1952 meeting. ADT too concluded that this was a satisfactory basis of compromise. Its strong appeal to it was its solution of the problem of continuity of service with which it was so concerned. Further, plaintiff's rate of participation would be lower than the 25 percent to which it could well lay claim. In addition, such a settlement would give ADT complete freedom with respect to new business written after February 18, 1954, and thus alleviate at least this aspect of its antitrust concerns.

With an agreement in the making, an important negotiation meeting was arranged for June 16, 1952, at which the presidents of both corporations would be present. Shortly prior thereto, the president of ADT reported to its Board of Directors, at a meeting held on June 11, 1952, the agreement of ADT's president, vice president, and counsel that,

with the 1907 agreement expiring, a satisfactory method of liquidating plaintiff's equity in the business resulting from the joint venture doctrine had to be found, that a tentative agreement, as above described, had been arrived at at the 20 percent rate and covering only the service contracts in existence on February 18, 1954, and that in their opinions, such a settlement constituted the exercise of reasonable business judgment.

Thus did the parties come together on June 16, 1952 and, after another long and hard negotiating session, finally hammer out an agreement. Plaintiff formally conceded its obligation to leave the actuating devices in place, thus definitely allaying any remaining ADT fears of abrupt removal, but also claimed the correlative right to continue to receive 25 percent of the contract revenues from service contracts in effect as of February 18, 1954. ADT protested that plaintiff had already in effect offered to take only 20 percent. It argued that based on its own estimates of plaintiff's investment (since plaintiff had consistently refused to open its books to ADT), plaintiff's participation should fairly not exceed 12½ percent, but in an effort to bring the lengthy negotiations to a close, it would agree to pay 15 percent of the gross receipts from contracts in service on February 18, 1954, frozen at the then schedule of charges. Further ADT again raised the problem that had long ago been discussed of the unsatisfactory situation arising from the dual ownership of the actuating devices, and recalled plaintiff's tentative agreement to purchase the de-

vices which ADT had replaced and therefore owned. Finally, plaintiff offered to split the difference between its previous offer of 20 percent and ADT's offer of 15 percent. ADT agreed provided plaintiff would purchase the ADT replacement devices at a figure to be agreed upon (the previous agreed price of $535,000, based on 1948 figures, now being out of date), with plaintiff thereafter, at its own expense, to be responsible for all required maintenance, repair, and replacement of the devices installed on subscribers' contracts in service on February 18, 1954. Plaintiff agreed and a mutual understanding finally resulted, solemnized by the presidents of the two companies shaking hands (the meeting thereafter consequently being referred to as the "handshake meeting"), subject, however, to approval by the ADT Board of Directors (such similar approval by plaintiff's Board evidently not being required). The attorneys for the parties were to work out the details of the agreement.[4]

Some three weeks later ADT's Board of Directors met to consider the matter. The Board first studied figures ADT personnel had compiled setting forth their estimate of the reasonable worth of plaintiff's terminal equity in the contract. Such equity was calculated at 19.6 percent of the projected gross receipts for an estimated 20 remaining years, thus justifying the 17.5 percent agreement even without the two additional favorable features, i. e., the purchase of the ADT devices and the complete assumption by plaintiff of the maintenance and replacement obligation.[5] Thereupon, the Board

4. The plan was to have the agreement executed prior to commencing negotiations with AFA on the second 1907 agreement pertaining to the four cities. By this time plaintiff owned almost 90 percent of the stock of AFA. If the plaintiff-ADT agreement, resulting from arm's-length bargaining, were to serve as a precedent, plaintiff would be protected from charges of unfairness in dealing with AFA.

5. The figures were based on the assumption of the validity of plaintiff's "partnership" theory entitling plaintiff to a

50 percent interest in all of the service contracts in effect on February 18, 1954, which, it was estimated, would, on an overall basis, continue for 20 years thereafter. The average annual gross receipts, on a 20-year diminishing basis, was estimated at $6,200,000, with plaintiff's 50 percent interest thus being equal to $3,100,000 gross, and $966,000 net, which, capitalized at 10 percent, resulted in a terminal equity value of $9,660,000. Since such value was to be paid in installments over the 20-year period, interest at 5 percent, computed quarterly

authorized the execution of a satisfactory agreement embodying the three components of the agreement.

Plaintiff's counsel then immediately commenced preparing the agreement, the forms of the early drafts reflecting the three elements agreed upon. During this period, representatives of the parties met several times to iron out various details pertaining to the formal agreement, the most important of which was the determination of the price to be paid by plaintiff for the ADT replacement devices. The price finally agreed upon was $677,061.10.

Plaintiff had always treated the 25 percent revenue participation receipts under the 1907 agreements as ordinary income. However, during the drafting of the formal agreement, plaintiff's counsel concluded that if that part of the agreement relating to the revenue participation payments were to be cast in the form of a conditional sale of the actuating devices by plaintiff to ADT (including those contemporaneously being sold by ADT to plaintiff), with the 17½ percent receipts being considered as purchase price installment payments, such receipts would be entitled to capital gains treatment as for a sale of capital assets. Plaintiff was not concerned with title to the devices passing to ADT when the subscribers' contracts would in due course expire. After 20 years, the average life of such contracts, the devices would have only minimal residual value anyway. Plaintiff's counsel thereupon inquired of ADT whether it would be willing to have that part of the agreement cast in such form. ADT responded that it would have no objection to the agreement's being drawn in a form favorable to plaintiff from a tax standpoint provided its own tax position would not be prejudiced. The 25 percent revenue participation payments to plaintiff

had long been established as a deductible business expense to ADT. ADT's concern was whether the 17½ percent payments, if cast in the form of installment payments on account of a conditional purchase of capital assets, would similarly be fully deductible as a depreciation allowance. It deferred committing itself until its tax counsel could examine the problem.

After consideration, ADT counsel stated that, in their opinion, full payment deductibility by ADT would be less of a problem if the transaction were cast in the form of a lease of the devices, with the 17½ percent payments being considered as rental payments.[6] Counsel felt, however, that a sale form presented more serious problems because of the fact that the payments were to continue for an indeterminate period. Counsel concluded they could not advise ADT to accept the sale form unless ADT received a satisfactory ruling from the Treasury Department.

Plaintiff's counsel then suggested that the part of the agreement relating to the 17½ percent payments be drawn in both sale and lease forms, the sale form to be executed if both plaintiff and ADT received favorable Treasury rulings, and the lease form to be executed if they did not. This procedure was agreed to and on December 29, 1952, the parties entered into a letter agreement providing for the purchase by plaintiff of the ADT replacement devices for $677,061.10, for plaintiff's taking over the obligation of making any further replacements, and for the later execution, after obtaining Treasury rulings, of a contract in either of two annexed forms, one being for the lease (annexed as Exhibit B) and the other for the sale (annexed as Exhibit C) by plaintiff of the devices. Both forms were substantially similar, providing, after February 18, 1954, for pay-

---

on unpaid balances, added almost $4,900,000, thus giving a total value of $14,550,000 to plaintiff's terminal equity. This was 19.6 percent of estimated 20-year gross receipts of $74,000,000.

6. Counsel even entertained some doubts as to the full deductibility of such lease-rental payments because of the fact that the devices would probably have no further useful life at the discontinuance of service.

ments to plaintiff of 17½ percent of the basic annual service charges in effect on such dates until the discontinuance of the service. The only basic difference was that plaintiff, under the lease form and ADT, under the conditional sale form, had the duty to remove and the right to salvage the devices at the expiration of the service contracts.

About seven months later, i. e., on July 28, 1953, plaintiff, by the purchase of a large block of ADT stock, became the majority and controlling stockholder of ADT.

On December 24, 1953, plaintiff, ADT, and AFA entered into agreements concerning the second 1907 agreement which were substantially the same as that of December 29, 1952 between plaintiff and ADT relating to the first 1907 agreement (with plaintiff paying ADT $203,877.06 for the ADT replacement devices located in the four cities).

Although as of February 18, 1954, no Treasury rulings had as yet been sought, payments in the reduced amount of 17½ percent began being made to plaintiff under interim agreements. On May 29, 1954, ADT, submitting both forms of lease and sale contracts, finally applied for the ruling. Plaintiff decided not to seek any such rulings. In October 1954, ADT received a ruling to the effect that it could deduct the full amount of the payments regardless of which form of contract was executed, and on December 2 and 15, 1954 plaintiff and ADT, on the first date, and plaintiff, ADT, and AFA, on the second, executed the conditional sale form of agreements (referred to as "the 1954 agreements"), both made effective retroactively to February 18, 1954.

From and after February 18, 1954, the relations of the parties have been governed by the terms of the 1954 agreements, plaintiff receiving 17½ percent on all subscribers' contracts in existence on such date, and assuming the maintenance and replacement obligation.[7] Upon expiration or discontinuance of service under a subscriber's contract, ADT and AFA have, as owners, been removing and retaining the actuating devices.

Plaintiff has received no revenue participation payments with respect to new supervisory service contracts entered into by ADT or AFA after February 18, 1954 (although plaintiff, as majority and controlling stockholder of both companies has, of course, generally profited from such business).

It is the 17½ percent receipts under the 1954 agreements for only two years, i. e., over $1,155,500 during 1954 and $1,455,000 during 1955, which are at issue in this case, plaintiff contending they constitute bona fide installment payments on account of valid contracts for the conditional sale of the actuating devices to which it is entitled (as to those devices held longer than six months) long-term capital gains treatment, and defendant contending essentially that in reality the payments constitute nothing more than a continuation of the same type of contract income, although in a reduced amount, which plaintiff had always consistently and correctly treated as ordinary income for tax purposes.

■ In a case such as this, where the true substance of the transaction is sought, despite the "sale" form in which it was cast, the answer is necessarily to be found in the preceding events indicating the motivating factors and the basic business and economic considerations upon which the ultimate agreement was grounded. Here, as was true in Commissioner of Internal Revenue v. Court Holding Co., 324 U.S. 331, 65 S.Ct. 707, 89 L.Ed. 981 (1945), where the question involved was by which of two parties a sale was actually made despite the formal terms of the sales contract, " * * * the transaction must be viewed as a

7. The agreements contained provisions whereby the parties could terminate such obligation at the end of five years, with an appropriate adjustment, however, to be made in the payments. On February 18, 1959, such obligation was terminated, and, in accordance with the contract adjustment formula, the installment payments were thereafter reduced to 17.2 percent.

whole, and each step, from the commencement of negotiations to the consummation of the sale, is relevant." (at 334, 65 S.Ct. at 708.)

In this light, a consideration of the entire significant background of the 1954 agreements, as hereinabove detailed, requires the conclusion that the 17½ percent payments do not, as plaintiff contends, solely constitute consideration for a sale of plaintiff's actuating devices. That was not at all the purpose which such revenue participation payments were intended by the parties to serve. Instead, those payments were agreed to in recognition of plaintiff's right to continue to receive a share of the receipts from all subscriber contracts written prior to, and therefore subject to the terms of, the 1907 agreements. Plaintiff's share of the income from such subscriber contracts had always been treated by it, and obviously correctly so, as ordinary income. Its continued receipt of such income, even though in a smaller percentage (Cf. Hort v. Commissioner of Internal Revenue, 313 U.S. 28, 61 S.Ct. 757, 85 L.Ed. 1168 (1941)), must necessarily also fall in the same category.

That the 17½ percent payments were in actuality only a continuation, as a conceded contract right, of the sharing of the revenues from subscribers' contracts, and not consideration for the sale of actuating devices, is made plain by the final bargain that was struck after the frustrated earlier negotiations. The long years of negotiations concerning a renewal agreement that would cover, as did the 1907 agreements, all supervisory fire alarm business written came to naught. But ADT's decision not to become a party to such an all-embracing renewal agreement could not negate the fact that the parties had vested interests in the old contract. After contending that it would, as of February 18, 1954 termination date, own 50 percent of the business covered by such contract plaintiff, commencing with the meeting on November 14, 1951, claimed (consistent with its partnership theory) a contract right to continued entitlement to 25 percent revenue participation from all subscribers' contracts in force on such expiration date on the grounds that such subscribers' contracts, written prior to the expiration date, would, until they expired, be subject to the terms of the 1907 agreement. This would necessarily also mean, of course, that plaintiff would be obliged to leave its actuating devices in place until service to the subscriber expired. This was a rational interpretation and obviously commended itself to ADT, for it itself advanced such approach at the next meeting of February 19, 1952, provided plaintiff's percentage participation would be lowered, as ADT had consistently argued it should be, and also provided that the percentage apply to the particular subscriber's contract throughout its life at the revenue scale in effect thereon on February 18, 1954. Plaintiff appeared amenable to this suggestion, indicating a willingness to lower its percentage participation to 20 percent. And at the final handshake meeting of June 11, 1952, after formally conceding its obligation to permit the actuating devices to remain in place on contracts in force on February 18, 1954, but reaffirming its continuing right also to share in such contract revenues, the final agreement was consummated at 17½ percent applied to frozen revenue scales, on further condition, however, that plaintiff purchase the ADT replacement devices and thereafter assume the entire maintenance and replacement obligations.[8]

These were the three important and controlling negotiation sessions out of which the final agreement evolved and was consummated. Not a word was said during those sessions about a sale of any devices to ADT. Plainly, the essence of the agreement, which constituted a closing out of the old agreement, was a continuation, at a reduced rate, of plaintiff's participation in the revenues flow-

---

8. E.g., at least for five years, with an appropriate adjustment downward in the revenue participation payments thereafter if such obligation was not continued. See n. 7.

ing from the subscribers' contracts covered by the 1907 agreement until such contracts all expired (an estimated 20 years). Those revenues clearly constituted a flow of ordinary income to plaintiff, as they always had. It was plaintiff itself who had consistently insisted that a sale of the devices alone would not serve to satisfy its terminal contract rights. Thus its position necessarily was that no sales price that would reasonably reflect the value of the installed devices as property would compensate for what it felt it was entitled to as a partner and as a matter of contract right.

Plaintiff argues that regardless of the agreements formulated at the handshake meeting, the parties thereafter, in further bargaining sessions, decided on a sale of the actuating devices, the consideration to consist of the already agreed upon $17\frac{1}{2}$ percent revenue participation, all as set forth in the 1954 agreements. The contention must be rejected. The further bargaining sessions were not designed to change the basic substance of the agreement formulated at the handshake meeting. They were held to work out the details of effectuating it. The principal open matter to be settled was the price plaintiff was to pay for the ADT replacement actuating devices. The proof is clear that the sole motivating factor in casting the agreement in the "sale" form was the long-term capital gain tax benefit plaintiff could claim as for a sale of capital assets.

When the decision to frame the agreement as a conditional sale was reached, such a transaction had no substantial business significance to the parties. It was essentially meaningless. It is true

that during the early stages of the negotiations ADT had offered to purchase the actuating devices. But such offers were made, first, in connection with an apparent desire to effectuate an immediate termination of the parties' relationship, and later, in addition, to prevent an abrupt termination of service on February 18, 1954. However, neither consideration played any part in the formulation of the final agreement. As to the first, plaintiff, after flatly rejecting ADT's suggested purchase offer, made perfectly plain that it was not to be eliminated from the business by a straight sale of all its installed devices, and that its contribution to the business went beyond being a mere supplier and installer of materials.[9] And the second consideration was of no concern whatsoever to ADT after plaintiff conceded that, under a proper contract interpretation, plaintiff would be obligated to leave the devices in place as long as the subscriber was, under his contract, entitled to central station service.

It is not that a bona fide sale of installed actuating devices was not capable of being made. Indeed, plaintiff did, for a fixed sum, purchase the ADT installed devices. It is simply that in view of the nature, purpose, and effect of the agreements arrived at at the handshake meeting, a subsequent conditional sale of the devices by plaintiff to ADT served no substantial business purpose. As long as the devices remained in place until service at the subscriber's premises terminated in due course, who had title to the devices was quite unimportant. At the end of the 20-year average life of a subscriber's contract, the salvage value of the devices, considering removal and rehabilitation costs, was minimal.[10] Just

9. As shown, it is also true that at that time, plaintiff made certain offers to sell some of its devices provided ADT would, however, sell certain of its central station facilities and provided also certain noncompetition agreements would be observed. However, ADT rejected these offers.

10. During the term of the 1907 agreements, plaintiff salvaged and reused only

21.6 percent of the actuating devices on subscribers' contracts which had expired or where service was reduced. However, the cost of removing and salvaging the devices generally approximated their salvage value. Devices considered not worth removing were simply left in place but rendered unserviceable. Under the 1954 agreements, ADT apparently instituted a more active salvage program, salvaging

as the solution the parties arrived at at the handshake meeting made the whole problem of who would own the service contracts as of February 18, 1954 unimportant because, if such contract continued until it expired, no one would then care who had owned it, so was the question of who would own the devices at the expiration dates of the subscribers' contracts quite unimportant, for the devices would then have only minimal value anyway. Strong proof of the validity of this analysis is that when ADT decided to go along with plaintiff's desire to have the agreement take the form of a sale, no additional compensation of any kind was made for its conditional "purchase" of the devices.

▉▉ Further, it is difficult indeed to fit this transaction into the mold of a "sale". Unlike the normal sale of tangible, physical property, there was here no price fixed for the property such as is usually the situation. That such a price for this particular kind of property could be fixed is plain, for the parties did in fact do so when, as a part of this very transaction, plaintiff purchased the ADT replacement devices at fixed prices. However, the "price" here involved was, instead, indefinite, and depended wholly on how long the subscriber's contract would last. No better argument could be made in this connection than was made by plaintiff's then counsel himself when, in addressing himself to the question of the applicability of the sale and lease provisions of the Clayton Act to the parties' relationship under the 1907 agreements, he concluded that there was no sale because what plaintiff received could not be considered as a "price" for the devices, the revenues bearing no relationship to the cost of furnishing and installing the devices "as a normal commercial price would be." The 25 percent revenue participation, he said, was in consideration of the many services plaintiff performed under the 1907 agreements, as well as the noncompetitive and mutual

cooperation covenants it had observed. This part of his analysis was unquestionably sound. As was recently reiterated in Commissioner of Internal Revenue v. Brown, 380 U.S. 563, 571, 85 S.Ct. 1162, 1166, 14 L.Ed.2d 75 (1965), " 'A sale, in the ordinary sense of the word, is a transfer of property for a fixed price in money or its equivalent', State of Iowa v. McFarland, 110 U.S. 471, 478, 4 S.Ct. 210, 28 L.Ed. 198; * * *." And the same analysis by counsel would necessarily apply to the 1954 agreements, since the 17½ percent participation under these agreements only constituted, as stated, continued payments in consideration of plaintiff's having performed and continuing to perform such services, for the 1954 agreements were concerned only with subscribers' contracts covered by the 1907 agreements and upon which it was conceded that plaintiff had earned, under such 1907 agreements, the right to continued revenue participation. The test ADT applied to the reasonableness of the 17½ percent payments to plaintiff had nothing to do with a sales "price" of actuating devices. It was, instead, a valuation of plaintiff's terminal equity in the contract, based on the partnership theory and plaintiff's right thereunder to 50 percent of the total of the gross contract revenues over a 20-year period (the estimated length of the 1954 agreements). From such figures was derived plaintiff's estimated net annual income, which was then capitalized at 10 percent. Thus, as the parties reasonably construed their rights and obligations during the closing out process of the 1907 agreements, ADT was entitled to the continued dedication of plaintiff's actuating devices to the subscribers' contracts, and plaintiff was entitled to continued revenue participation, until such contracts expired. Since future title to the devices, a question which plaintiff now treats as one of first importance, was thus in fact wholly unimportant in a determination of such terminal rights issue, there was

---

(at least up to October 31, 1958) and reusing approximately 71 percent of the devices it removed. However, the record

does not show what the relation was between the salvage value and the removal and rehabilitation costs.

no necessity whatsoever for any sale of plaintiff's devices.

Plaintiff points out that to constitute a valid sale in law it is not necessary to have a fixed price. Instead, it argues that prices may validly be indeterminate and measured by a fixed percentage of gross receipts over periods indefinite in time, that a conditional sale of property so fashioned would be valid under state law, and that such transactions have been held to qualify as long-term sales of capital assets under the Federal income tax laws. The indeterminate price or consideration cases are for the most part those involving unlimited use of intangible property, such as patents, United States v. Dresser Industries, Inc., 324 F.2d 56 (5th Cir. 1963); Merck & Co. v. Smith, 261 F.2d 162 (3d Cir. 1958); Dairy Queen of Oklahoma, Inc. v. Commissioner of Internal Revenue, 250 F.2d 503 (10th Cir. 1957); Commissioner of Internal Revenue v. Hopkinson, 126 F.2d 406 (2d Cir. 1942); Coplan, 28 T.C. 1189 (1957); Rose Marie Reid, 26 T.C. 622 (1956); Myers, 6 T.C. 258 (1946); copyrights and literary compositions, Stern v. United States, 164 F.Supp. 847 (E.D.La.1958), aff'd 262 F.2d 957 (5th Cir. 1959), cert. denied, 359 U.S. 969, 79 S.Ct. 880, 3 L.Ed.2d 836, trade names, *Rose Marie Reid,* supra; and various situations involving stock sales, Burnet v. Logan, 283 U.S. 404, 51 S.Ct. 550, 75 L.Ed. 1143 (1931); Tuttle v. United States, 101 F.Supp. 532, 122 Ct.Cl. 1 (1951); Haynes v. United States, 50 F.Supp. 238, 100 Ct.Cl. 43 (1943); Marshall's Estate, 20 T.C. 979 (1953); Nicholson, 3 T.C. 596 (1944). It is often difficult to determine the value of intangible property, and what, therefore, a fair price would be. It is also true that, when there is a bona fide sale, the mere fact that the purchase price may be payable in installments over a period of time does not necessarily serve to defeat the right to capital gains treatment, Commissioner of Internal Revenue v. Brown, supra (the price of the stock involved here, however, being fixed, not indeterminate).

And such installment payment technique may well serve to eliminate the "bunching" of the fruits of a capital gain in the year of the sale of the capital asset. Commissioner of Internal Revenue v. Ferrer, 304 F.2d 125 (2d Cir. 1962).

■ However, such factors are only helpful as guidelines to the determination of the basic question in the individual case of whether, for Federal income tax purposes, there was in actuality a bona fide sale of true economic or valid business significance. Whether a "sale" transaction constitutes a valid transfer of property interests under state or ordinary commercial law is certainly relevant, Commissioner of Internal Revenue v. Brown, supra, but it is far from determinative of the question of how such interests are to be taxed under the Federal income tax laws. Watson v. Commissioner of Internal Revenue, 345 U.S. 544, 73 S.Ct. 848, 97 L.Ed. 1232 (1953); Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932). Technical property concepts are not controlling in matters of taxation, Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958); Wilkinson v. United States, 304 F.2d 469, 157 Ct.Cl. 847 (1962); Arnfeld v. United States, 163 F.Supp. 865, 143 Ct.Cl. 277 (1958), cert. denied, 359 U.S. 943, 79 S.Ct. 722, 3 L.Ed.2d 676 (1959). And the unusual nature of the consideration for the particular kind of property involved is also relevant in ascertaining, for income tax purposes, the true nature of the transaction. Lemon v. United States, 115 F.Supp. 573 (W.D.Va.1953). Especially would this be true here where plaintiff itself took the flat position earlier in the negotiations that no sale of the tangible property here involved could rationally be considered as having taken place principally because of the indeterminate nature of the revenue participation and the consequent lack of establishment of a true "price" in the ordinary commercial sense.

■■ For all of the reasons set forth above, it must be concluded that, consid-

ering the basic nature, purpose, and economic incidents of the 1954 agreements involved in this case, the 17½ percent payments thereunder were not made solely, as plaintiff claims, in consideration of a conditional sale of the actuating devices. The parties actually intended that the payments should constitute compensation for other interests, i. e., plaintiff's terminal rights in the 1907 agreements, particularly its right to receive future income therefrom. The agreements were cast in such sale form for the sole purpose of converting the right to receive future ordinary income into a long-term capital gain, and with no other significant business or economic effect. This is not permissible. Commissioner of Internal Revenue v. P. G. Lake, Inc., supra (consideration received for "sale" of oil payment rights was essentially only a transfer of the right to receive future income); Roth v. Commissioner of Internal Revenue, 321 F.2d 607 (9th Cir. 1963) (payments for "sale" of interest in a partnership whose sole asset was the right to receive a percentage of future gross revenues, the sales "price" being substantially equivalent to such revenues, treated as ordinary income, the transfer of legal title to the partnership interest having no economic significance or value); First National Bank of Kansas City v. Commissioner of Internal Revenue, 309 F.2d 587 (8th Cir. 1962) (gain from sale of annuity policy just prior to first payment treated as ordinary income); Commissioner of Internal Revenue v. Phillips, 275 F.2d 33 (4th Cir. 1960) (excess of cost of endowment policy "sold" just prior to maturity taxable as ordinary income); Tunnell v. United States, 259 F.2d 916 (3d Cir. 1958) ("sale" of interest in law partnership, consisting largely of fees already earned and which would have been taxable as ordinary income); United States v. Snow, 223 F.2d 103 (9th Cir. 1955), cert. denied, 350 U.S. 831, 76 S.Ct. 64, 100 L.Ed. 741 (proceeds from sale of partnership interest taxable as ordinary income to extent they represented undistributed partnership earnings); Wilkinson v. United States, supra (purchase of right to receive future income under a contract does not convert the income into a capital asset); Arnfeld v. United States, supra (increment realized on annuity policy by a "sale" of the contract prior to maturity treated as ordinary income). The installment "conditional sale" payments were here "merely a substitute", Hort v. Commissioner, supra, 313 U.S. at 31, 61 S.Ct. 757, for the revenue participation payments. "Their [the arrangements'] essence is determined not by subtleties of draftsmanship but by their total effect." Commissioner v. P. G. Lake, Inc., supra, 356 U.S. at 266–267, 78 S.Ct. at 695. The principle that a taxpayer may reduce his taxes by all methods which the law permits "does not prevent the Government from going behind the form which the transaction takes to ascertain its reality." Fisher v. Commissioner of Internal Revenue, 209 F.2d 513, 515 (6th Cir. 1954), cert. denied, 347 U.S. 1014, 74 S.Ct. 868, 98 L.Ed. 1136.

Plaintiff correctly points out that the parties have in fact treated the 1954 agreements as effecting a transfer of title to the devices. When a service contract has expired in due course it is ADT, not plaintiff, who removes and, as owner, retains the device for reuse or otherwise. However, although the question as to who had title to the devices at the end of the subscriber's contract was as noted, considered by the parties as being of relatively little importance (the "lease" or "sale" forms were equally satisfactory, with no difference in consideration), there is no reason to invalidate the parties' agreement in this particular respect or their apparent intent to shift such title to ADT at that time. Cf. First National Bank of Kansas City v. Commissioner of Internal Revenue, supra (that a sale is bona fide does not in itself serve to transform into capital gain what would otherwise constitute ordinary income). But, as stated, no

additional consideration was paid for this title shift. If the parties felt that consideration for the shift was in some measure blended into the 17½ percent, the burden is on the taxpayer to establish the value attributable to the capital assets transferred. Roth v. Commissioner of Internal Revenue, supra. Here, the record is bare as to how much could reasonably be attributed thereto. Where part of a transaction calls for one tax treatment and another for a different kind, an allocation is required. Helvering v. Taylor, 293 U.S. 507, 55 S.Ct. 287, 79 L.Ed. 623 (1935). Lacking such allocation data, none can here be made as a basis for long-term capital gains treatment. Roth v. Commissioner of Internal Revenue, supra; Commissioner of Internal Revenue v. Ferrer, supra; Ditmars v. Commissioner of Internal Revenue, 302 F.2d 481 (2d Cir. 1962). In any event, it is plaintiff's basic contention that the entire amount of the 17½ percent payments, allegedly being solely attributable to a sale of the devices, is entitled to capital gains treatment.[11] As shown, the record fails to support this contention.

Defendant argues that, even conceding that there was a "sale" of the actuating devices in the sense that, at the expiration of a subscriber's contract, legal title passed to ADT, nevertheless the 17½ percent payments were not made solely in consideration thereof because they allegedly also represented consideration for a continued noncompetition agreement between the parties. Such an agreement, defendant contends, is necessarily to be implied as an integral part of the 1954 agreements. However, in view of the determination that the payments were in fact made in recognition of plaintiff's right under the 1907 agreements to continue to participate in the revenues flowing from the subscribers' contracts covered thereby until such contracts expired, it is not necessary to consider this additional contention.

In response to defendant's contention that no sale by plaintiff of the actuating devices could in any event take place in 1954 because title to them had, as a result of the substantial payments made to plaintiff over the years, already passed to ADT and AFA during the term of the 1907 agreements, the parties have argued extensively the question of whether plaintiff retained title to the devices throughout the entire period of the 1907 agreements and whether, therefore, it had any remaining ownership interest in them to sell in 1954. This basis for the rejection of plaintiff's claim lacks merit. No substantial support for such a passage-of-title contention can be found in the 1907 agreements, and the consistent practical interpretation of the agreements by the parties themselves over the years was otherwise. As early as 1915, ADT's then counsel advised ADT that the devices plaintiff originally installed would belong to plaintiff throughout the entire term of the agreements (although he also concluded that the use of the devices was "devoted" to the service of the subscriber until his contract expired), and ADT conducted itself accordingly throughout. On the expiration of a service contract, it was plaintiff who, as owner, exercised control over such devices, either salvaging them or rendering them inoperable. Indeed, the transactions whereby plaintiff, for substantial fixed sums, purchased, on an immediate transfer of ownership basis, the ADT-owned replacement devices would otherwise be meaningless. The very basis for these sales was a recognition that plaintiff owned all the

---

11. Paragraph 152 of a comprehensive pretrial stipulation filed in this case provides that " * * * the parties agree that the sole issue involved in this litigation is whether monies received by plaintiff from ADT and AFA pursuant to the agreements * * * constitute, *in their entirety*, payments by reason of sales by plaintiff to ADT and AFA of installed actuating devices." Paragraph 155 is to the same effect referring to the "monies received by the plaintiff pursuant to such agreements" being "*solely* in payment for and in respect of sales of the installed actuating devices * * *." (Italics supplied.)

devices except the ADT replacement ones, and a desire by the parties to have ownership of all the devices vested in plaintiff.

In this connection, however, it is pertinent to note the lack of importance attached by the parties to the relationship between ownership of the installed devices and plaintiff's entitlement to revenue participation because where, after plaintiff's original replacement obligation ($5,000) was fulfilled so that further replacements were made for the account of ADT with ownership of such replacement devices being vested in ADT, plaintiff's 25 percent revenue-participation payments nevertheless still continued undiminished. The essential reasons for vesting title to all the devices in plaintiff —outside of avoiding future arguments and possible litigation on further agreement termination dates as to exactly which of tens of thousands of devices belonged to whom—lay in practical, operational considerations concerning plaintiff's taking over, for its own account (since it had been the actual installer of all the devices, including those installed for the accounts of ADT), the entire repair, maintenance and replacement responsibility.

For all of the reasons hereinabove set forth, the petition should be dismissed.[12]

---

12. By paragraph 155 of the stipulation the parties stipulated that if there was a valid sale of the actuating devices for which the 17.5 percent payments constituted the sole consideration, then the devices met the requirements of "property used in the trade or business" as defined in section 1231(b) of the 1954 Code. By the stipulation, and at the pretrial conference, the parties also agreed upon the issues involved in the case. In effect these stipulations constituted an agreement that the devices did not consist of stock in trade and were not held primarily for sale to customers in the ordinary course of business. Section 1221 excludes such property from the definition of "capital assets" and section 1231 (b) excludes it from the definition of "property used in the trade or business." (26 U.S.C. §§ 1221, 1231 (1958 ed.).)

Despite this situation, defendant thereafter took the position that even if the compensation plaintiff received be deemed the proceeds of a sale rather than the continuation of its revenue participation arrangement, such compensation represented the proceeds of sales of plaintiff's stock in trade and were sales made in the ordinary course of plaintiff's business, thus falling in the ordinary income category anyway.

However, plaintiff protested that, because of the stipulation and the pretrial agreements, it had not introduced any evidence bearing on this capital asset question. Because of such prejudice, it urged that defendant be held to its stipulation and pretrial agreements.

Defendant has now withdrawn this additional contention.